#### (33 South. 628.)

#### No. 14,170.

#### McDADE et al. v. BOSSIER LEVEE BOARD.

#### (May 26, 1902.)

SWAMP LANDS — LEVEE BOARD — GRANT BY STATE—CONSTRUCTION—LAKE—FAILURE TO SURVEY—OVERFLOWED SWAMPS—BEDS OF SHALLOW LAKES — ESTOPPEL OF STATE — POSSESSOR IN BAD FAITH — LIABILITIES — PRE-EMPTION RIGHTS.

1. The state having selected the land in controversy as swamp and overflowed land passing to her from the general government under the swamp-land grants of 1849 (9 Stat. 352, c. 87) and 1850 (9 Stat. 519, c. 84), and the land department of the general government having approved the selection, and the state having granted and conveyed the said land to the defendant board, the title to said land is held to be vested in the defendant board.

2. Because in the survey of the township the section lines were not run across the traverse of a water-covered area, or so-called lake, of about 1,000 acres in extent, of irregular shape, lying diagonally across the township, and cutting off the corner of some sections, and passing through the body of others, but not covering any single section in its entirety, and because this water-covered area was not surveyed, nor its acreage computed, is no reason why such survey was not sufficient to serve as a basis for selection by the state, and approval by the general government, of the swamp and overflowed land within the township, under the swamp-land grants of 1849 and 1850. Such survey established the section corners and located the sections, and identified the land, and determined its swamp and overflowed character, and nothing more was needed for the purposes of the grants in question.

3. The sections affected by this so-called lake, having been selected and approved in their entirety, passed to the state in their entirety—that is, including their water-covered part; and this notwithstanding that the area of this water-covered part was not included in the acreage specified for the contents of the sections. As between the state and the general government, in the selection and approval of swamp and overflowed land under the grants of 1849 and 1850, acreage cut no figure; the whole of the swamp and overflowed lands having been granted regardless of acreage.

4. Permanently overflowed swamps, or so-called shallow lakes, destined to become dry as the direct and necessary effect of the building of the levees in aid of the construction of which the swamp-land grants of 1849 and 1850 were made, passed as land under those grants. The acts making the grants contemplated that these areas would be reclaimed, and therefore, within the purview of the acts, they were land.

5. Act No. 247 of 1855, providing that the beds of shallow lakes should be treated as land, is binding on all those who acquired under said act. As to them the beds of such lakes are not mere water-covered areas accessory to the dry land, but are land, insusceptible of acquisition by accretion or reliction.

6. The state acquired the whole of the sections, and sold to plaintiff's authors only part. She acquired by grant made irrespective of acreage, and sold at so much per acre. She therefore did not sell to plaintiff's authors the same land she had acquired.

7. The Register of the Land Office could not by any statement or admission of his estop the state from claiming title to lands belonging to her; nor could he estop the defendant board, whose agent he is not shown to have been at

09　626
111　917
11　919
11　924
09　626
13　329
113　341
09　626
16　889
09　626
21　416
109　626
123　25
123　218
125　755

the time the statements relied on are alleged to have been made.

8. One who, well acquainted with all the facts, but in error as to the law, has taken possession of property belonging to another, is a possessor in bad faith, and owes rents and revenues.

9. Where under the evidence the court can arrive at no satisfactory conclusion as to the amount either of the rents and revenues, or of the cost of clearing the land, and the two are approximately equal, it will offset the one by the other.

10. Pre-emption rights under Act No. 21 of 1886 can be acquired only on lands belonging to the state. They cannot be acquired on lands belonging to one of the levee boards of the state.

Breaux, J., dissenting.

### On Application for Rehearing.

11. By the terms of the ninth section of Act No. 89 of 1892, the grant of lands made to the Bossier levee district was not to become operative until formal act of conveyance of the lands so donated should have been made to the levee board by the Auditor of the State and the Register of the State Land Office.

12. The intention of the act was that neither the title to nor the possession of the lands donated was actually to vest in the levee board until the state officials named should have acted in the way the statute directs, and only when this was done, and the act of conveyance recorded, was the title and possession of the lands so conveyed to vest absolutely in the board.

13. Until title and right of possession thus devolved upon the board, it was in no position to demand rents of the plaintiffs, and its claim for rents extends no further back than the date of the conveyance made to it by the Auditor and Register of the State Land Office.

14. After the state had, by Act No. 89 of 1892, declared its purpose of donating the lands it owned within the limits of the Bossier levee district to the said district, it was not competent for the plaintiffs to acquire any rights in and to any portion of the lands under the terms of Act No. 21 of 1886, granting pre-emption rights to actual settlers.

(Syllabus by the Court.)

Appeal from judicial district court, parish of Bossier; John Thomas Watkins, Judge.

Action by J. T. McDade and others against the Bossier levee board. Judgment for plaintiffs. Defendant appeals. Reversed.

Andrew Jackson Murff and Thomas Fletcher Bell, for appellant. Alexander & Wilkinson, for appellees.

PROVOSTY, J. The matter involved in this suit is the title to a part of the land that was at one time the bed of Red Shoot Lake— one of those shallow lakes so common in the alluvial parts of the state. The lake has become dry as a result of the building of the levees along Red river, both by reason of flood waters being warded off, and by reason of the low-water level in the river being lowered, and thereby the drainage of the country improved.

Plaintiff has been in possession for several years. He claims title by right of accretion or reliction, he having been owner of the land bordering on the lake at the time that its bed became dry land. He complains that defendant has slandered his title, and he brings this suit for damages and for recognition of his title.

Defendant is one of the boards created by the state to have charge of the public levees. It claims title by grant from the state, and under a regular act of conveyance executed in accordance with the statute making the grant.

The bed of this lake, like all other lands in Louisiana not already owned by private persons, passed to the United States under the treaty by which France ceded Louisiana to the United States.

In 1849 (9 Stat. 352, c. 87) and 1850 (9 Stat. 519, c. 84) Congress adopted the acts of those years granting to the state of Louisiana all the swamp and overflowed lands within her limits for the purpose of aiding in the reclamation of these lands by the construction of levees and drains. Perhaps it may be as well to quote the exact language in which this grant is made. The language is the same in the two acts, and is found in their section 1, respectively, which reads, as follows:

"To aid the state of Louisiana in constructing the necessary levees and drains, to reclaim the swamp and overflowed lands therein, the whole of those swamp and overflowed lands which may be or which are found unfit for cultivation, shall be and the same are hereby granted to that state."

The two acts differ in two material particulars. In the act of 1849 the expense of making surveys is at the charge of the state, and the lands pass without the necessity of the issuance of a patent; the only thing necessary being a selection by the state, and an approval of the selection by the Land Department of the general government. In the act of 1850 the expense of the survey is at

the charge of the general government, and the title passes only by a patent. The act of 1849 is peculiar to Louisiana. That of 1850 is general to all the states.

Under neither of these grants can the title to lands pass from the general government to the state without there having been a survey under authority of the general government, and a selection by the state, and an approval by the Land Office of the general government.

Township 16 N., range 12 W., N. W. district of Louisiana, in which the bed of this lake is situated, was duly and regularly surveyed under authority of the general government in 1836. The township and section corners were established, and the township and section lines were run, except that the latter were run only to the margin of the lake. The contour of the lake was meandered, and the meander points were marked by posts.

This survey was duly platted, and we have the map before us. The lake lies diagonally across the northeast corner of the township. It is about seven miles in length, by a width varying from a few acres to about a mile; its area being 1,077 1/7 acres. It does not cover any single section, but cuts off the corners of some, and passes through the bodies of others. The sections are all laid off as regular sections, except that the space occupied by the lake is left blank—not traversed by any lines.

In 1852 the state duly and regularly selected in their entirety the sections thus partially affected by this lake, and the selection was duly and regularly approved by the General Land Office.

In 1892, at the organization of the defendant board, the state granted to it all the state lands within the limits of the district over which it was given authority, and afterwards this grant was made effective by conveyances executed by the Auditor and the Register of the State Land Office to the defendant board.

Under these circumstances, it would seem that the bed of this lake did pass from the general government to the state, and from the state to the defendant.

The contentions of plaintiff are numerous, but we think that none of them is tenable.

The first is that, the bed of this lake not having been surveyed, it did not pass to the state under the selection and approval in question.

It is true, the section lines were not run across the traverse of the lake, and the exact acreage was not ascertained; but the corners of the sections were established, and the lake was shown to be enclaved by lands of a swamp and overflowed character, and the section lines were run to the margin of the lake. This identified the lands and determined their swamp and overflowed character, and nothing more was required for the purposes of the acts of 1849 and 1850.

For the purposes of those acts, the exact area did not need to be ascertained, since the grant comprised the whole of the swamp and overflowed lands within the borders of the state, regardless of area. Besides, it seems late in the day to be discussing the sufficiency of this survey for serving the purposes of the acts of 1849 and 1850, when it has already, in point of fact, served those purposes; both the state and the federal authorities having already acted upon it in the matter of the selection and approval of the swamp and overflowed lands in the township.

The reason why the traverse of this lake was not surveyed, and its acreage ascertained, is fully explained by the remarks made by the Supreme Court of the United States in the case of Hardin v. Jordan, 140 U. S. 380, 11 Sup. Ct. 811, 35 L. Ed. 428. Speaking of a similar survey, the court there said: "It has been the practice of the government, from its origin, in disposing of the public lands, to measure the price to be paid for them by the quantity of upland granted; no charge being made for the lands under the bed of the stream or other body of water. The meander lines run along or near the margin of such waters are run for the purpose of ascertaining the exact quantity of the upland to be charged for, and not for the purpose of limiting the title of the grantee to such meander lines."

The survey we are dealing with was made in 1836, before the passage of the acts of 1849 and 1850, and at a time, therefore, when the purpose of making the survey was to ascertain the area of the dry land; no reckoning at all being taken of the water-covered land, which passed to the future gran-

tee or patentee as an accessory of the dry land. As observed by the court in the same case (page 381, 140 U. S., page 811, 11 Sup. Ct., 35 L. Ed. 428): "It has never been held that the lands under water in front of such grants are reserved to the United States, or that they can be afterwards granted out to other persons, to the injury of the original grantees."

But while this survey was thus made solely for the purpose of getting at the acreage of the dry land, and therefore left the wet land out of its computation of acreage, it nevertheless was just as efficacious for the purpose of identifying the lands and determining the question of their wetness or dryness, and of serving as a basis for the selection of the swamp and overflowed lands in the township, as if made specially for the purpose of such selection; and the authorities so considered it, since they acted upon it.

Not having ascertained the acreage of the lake, the surveyor naturally left this acreage out of his computation of the acreage of the sections bordering on the lake, and as naturally the sections and their acreage were put in the selection list in accordance with the survey (that is, minus the acreage of the lake), and the list was approved as made. Plaintiff contends that the effect of this was that not the entire sections passed to the state, but only the acreage specified as their contents, and that the water-covered area passed, if at all, only as an accessory to the dry land, and that, if so, it also passed to his authors in the same way when the state conveyed to them the same dry land.

Whether the bed of this lake would have passed to the state as water area accessory to the dry land, if it had not passed as land, need not be considered, for it is very clear that it passed as land. Ascertainment of acreage is indispensable in the case of land to be thereafter disposed of by the acre, but it is utterly unnecessary in the case of land to be disposed of by selection and approval under the swamp-land grants of 1849 and 1850. All that is necessary in carrying out those grants is that the lands be identified and their swamp character determined. The whole of the swamp lands, regardless of area, having been granted, the area can cut no figure in the matter of the selection and approval under the grant. Whether the area

in the selection list be of one acre or of a million acres can make absolutely no difference. In fact, the selection list might leave out altogether the specification of area, and no harm be done. We conclude that the controlling feature of the description of the land in the selection list was the designation of the sections, and not the specification of the number of acres they contained, and, as a consequence, that there passed to the state, not the specified acreage, but the sections in their entirety, as selected and approved.

We concede the contentions of plaintiff that "the evidence shows conclusively that the land in question was covered with water, or a lake, in 1850," and that "it is well settled that the Land Department of the United States is the final and exclusive judge of the character of lands intended to be granted, and when it acts its actions cannot be inquired into by any court in a judicial proceeding."

The reply is that there is no attempt on the part of defendant to set aside any decision or action of the General Land Office in connection with the land in controversy; that there is no attempt to coerce the United States Land Department into approving this land to the state of Louisiana, nor any attempt to overthrow a patent granted to this land as United States land; that, on the contrary, the contention of defendant is that the Land Department has, in point of fact, approved the land to the state.

We cannot concede that the General Land Office has ever decided that a so-called lake of this kind was not swamp and overflowed land, nor that such ruling, if made, would be binding on the courts of the country.

The published decisions of the General Land Office to which we have been referred, holding that the beds of lakes did not pass under the swamp-land grants, were made in cases where large navigable bodies of water were involved. We can readily see that the beds of Lakes Michigan and Erie did not pass under these grants of swamp and overflowed lands, and that for the same reason the beds of much smaller lakes did not pass; but to apply this doctrine to the overflowed swamps, or even to the shallow lakes, of Louisiana, is, in our view, totally inadmissible. Some letters of instructions by the General Land Office to the Surveyor General of Louisiana,

making such an application of the doctrine, are submitted to us in manuscript; but these rulings, if they can be called such, were not made in the adjudication of actual controversies, and have not the weight of decisions, and, if they had, we should not consider them persuasive. In our opinion, if they really intend to apply to the overflowed swamps of Louisiana the doctrine adopted with reference to lakes, they simply make a wrong application of a correct doctrine.

Under such misapplication of the doctrine in question, a goodly portion of the fairest cane and cotton fields of the Louisiana of to-day would have been the beds of lakes in 1849 and 1850, and the present possessors of them be without title.

Many of these were more deeply and widely submerged in 1849 and 1850 than was the land in controversy. To metamorphose these areas from water-covered swamp to smiling field was the very object and purpose of the grants, as, indeed, is expressly stated in the acts making them. The grant is made, says the act of 1849, "to aid the state of Louisiana in constructing the necessary levees and drains to reclaim the swamp and overflowed lands therein."

Are we to hold that the very water-covered lands that were to become dry as the direct, necessary, and inevitable result of the building of the levees in aid of which the grants were made, were not land, within the purview of the grants? Why, we should be going against the plain intent of the acts.

If Congress had intended that swamp lands alone should pass, why add the word "overflowed"? The word "swamp," without the addition of the word "overflowed," would have conveyed all lands so lacking in drainage as to be temporarily covered by water in rainy seasons. If such lands alone were intended to be conveyed, why add the word "overflowed"? Has the word "overflowed" any other meaning than "water-covered"? Water-covered areas are not to be taken out of the operation of the grant by so simple a process as calling them lakes. The land in controversy was not a lake, except in the sense in which the permanently water-covered parts of all swamps are lakes. Hunters walked all over it in the dry season. In some parts it was a mere slough.

The word "overflow" was added for the very purpose of bringing within the grant these permanently submerged areas. It does not apply to areas whose "overflow" is merely periodical or temporary. Heath v. Wallace, 138 U. S. 584, 11 Sup. Ct. 384, 34 L. Ed. 1063. Said the court in that case: "The term 'overflow,' as thus used, has reference to a permanent condition of the lands to which it is applied. It has reference to those lands which are overflowed, and will remain so without reclamation or drainage."

The reason why the beds of large lakes did not pass under the land grants in question is not because they were not land, for in point of fact they are land, but because such bodies of water are not susceptible of private ownership, and because, also, the grants were not made for the purpose of reclaiming them. They did not come within the contemplation of the acts.

However strong might be our inclination to follow the rulings of the General Land Department on questions so peculiarly within its province as the present one is, we cannot allow ourselves to follow these rulings blindly, abnegating our own common judgment. In the case of Hardin v. Jordan, supra, after the General Land Office had decided that certain submerged lands had not passed from the United States (become severed from the public domain), the Supreme Court of the United States held that they had passed (had become severed); that exalted tribunal thus giving to this court ample precedent for not yielding too subserviently to the authoritativeness of the rulings of the Land Department.

We conclude that the bed of this lake passed to the state as land, and that it passed to the defendant under the grant made to it by the state.

Under the very act under which the plaintiff's authors acquired from the state (Act No. 247 of 1855), these shallow lakes are required to be treated as land, and to be surveyed and sold as such. This, as a matter of course, excluded all question of accretion or reliction with reference to the bed of this lake. It being land, it could not be acquired by accretion or reliction. The bed of this lake and the lands bordering it belonged at that time to the state, and it was unquestionably within the power of the legislature to declare that they should be treated as land

surface, and not as water surface. Whether in Louisiana the beds of lakes can be acquired by accretion or reliction, quære.

There is no force in the contention that the state having conveyed to the plaintiff's authors by the same description by which she acquired from the general government, and by reference to the same survey and plats and field notes, the same ·area passed from her to plaintiff's authors as from the general government to her. In the first place, the state did not convey by the same description by which she had acquired. She acquired S. ½ of section 2; she conveyed fractional S. W. ¼ of the same section. She acquired the whole of section 11; she conveyed the lots 1, 3, and 4, and N. ½ of N. E. ¼, of the same section. She acquired all of section 12; she conveyed lots 3, 4, 5, 6, 8, 9, 10, 11 and S. W. ¼, of the same section. She acquired all of section 13; she conveyed lots 2, 3, and 4 of the same section. Reference to the map shows that no part of the land conveyed by the state includes the bed of this lake, except two or three acres at the S. W. corner of N. ½ of N. E. ¼ of section 11, and about 10 or 12 acres at the southwest corner of section 12.

In the next place, there exists between the selection and approval in question, and the conveyance by the state to plaintiff's authors, this radical difference: That the one was nothing more than an act declaratory of the character of certain lands, whereas the other was a sale at so much per acre. In the one, acreage cut no figure; in the other, it was the all-important point. A survey made to serve as a basis for the one would have for its sole purpose the identifying of the land and the fixing of its character. On the other hand, a survey made to serve as basis for the other would have for its purpose the ascertainment of the acreage.

It is undoubtedly true that, "where lands are granted according to an official plat of their survey, the plat, with its notes, lines, descriptions, and landmarks, becomes as much a part of the grant or deed by which they are conveyed, and, so far as limits are concerned, controls as much, as if such descriptive features were written out on the face of the deed or grant"; but this doctrine, for the reasons just stated, is entirely inapplicable to the case.

Coming to the matter of the settlement of accounts between the litigants for improvements, on the one part, and rents and revenues, on the other, we have to hold that, legally speaking, plaintiff has been a possessor in bad faith; and this we regret, for we are satisfied that morally he was in good faith. We take it to be proved that, before venturing to enter into possession of the bed of this lake, plaintiff and the other coterminous owners sought to make sure of their right by applying for information wherever it was to be had, and that they took possession only after the Register of the State Land Office had advised them that the lands had not passed to the state under the swamp-land grants.

Bearing upon this action of the Register of the State Land Office, we find in the brief the following: "Under this assurance given by an official of the state, acting within the scope of his official capacity, the plaintiff went into possession of the land in controversy, and made it valuable. The state acquiesced in this for years, and should now be estopped from asserting any claim to the land." This estoppel does not appear to be seriously urged. It was not pleaded, although plaintiff filed a very full replication to the reconventional demand of defendant. The Register is not shown to have been the agent of the defendant at the time the statement relied on is alleged to have been made; nor, if such, to have had authority to estop defendant in connection with its lands. The Register could not by any admission of his have estopped the state.

The very fact of plaintiff's having made inquiry shows that he suspected the defectiveness of his title and that his error was one of law and not of fact. Applying the law to this situation, the possession of plaintiff was in legal bad faith.

"Under the laws of Louisiana, the essential conditions of good faith in a possessor under a defective title are that he was ignorant of the defects which vitiated his title, and that he had just reason to believe that he was acquiring a good title. Hence these defects must have reference to some hidden or concealed facts, and not to ignorance of the law under which the title was a nullity." Heirs of Dohan v. Murdock, 41 La. Ann. 494, 6 South.

131. See, also, Railroad Co. v. Sledge, 41 La. Ann. 896, 6 South. 725, and Railroad Co. v. Elmore, 46 La. Ann. 1237, 15 South. 701.

The only evidence we find on the subject of the number of acres of which plaintiff has been in possession, and on the subject of the length of time he has had the enjoyment of the land, is the following testimony given by himself:

"Question. How many acres of land have you cleared? Answer. I suppose, about 80 acres. Q. You have it in cultivation? A. Yes, sir. Q. How long have you had it in cultivation? A. It has been cleared at intervals. I think at first we had in about 30 acres, about four or five years ago, and then we have put in a little each year, until now I have cleared about 80 acres."

The land, when cleared and ready for the plow, can be rented at $5 a year per acre; but this, of course, includes the use of houses and fences.

The witnesses diverge in their estimates of the cost of clearing the land, but we find that it is possible to have land of the same nature cleared at a cost of $10 per acre. Everything considered, we think that justice will have been done between the parties if the rents and revenues and the cost of clearing the land are made to offset each other; not including the rents of 1902, however, which will have to go to the defendant.

The plaintiff having been adjudged a possessor in bad faith, it is optional with the defendant to keep, or not, the buildings and fences. Civ. Code, art. 508. In the event they are kept, we fix the price of the double houses at $150 each, and of the single house at $125. And since we must fix some price on the partially rotten rail fence, which originally cost $100 per mile, and on the other fence, as to the cost of which there is no evidence, we fix such price at $50 per mile.

As we understand, plaintiff took possession of this land in 1895 or 1896—three or four years after it had been granted by the state to the defendant, and after it had, therefore, ceased to be state land. If so, Act No. 21 of 1886, granting pre-emption rights to actual settlers on state lands, is not applicable to the facts of the case, the land not having been state land when taken possession of; and we so hold.

It is therefore ordered, adjudged, and decreed that the judgment of the lower court be set aside; that the defendant be decreed to be the owner of the land in controversy; that the demand of the plaintiff for the cost of clearing said land, and the demand of the defendant for the rents and revenues of said land, be rejected, except as to the rents and revenues of the year 1902; that the plaintiff be, and he is hereby, ordered to demolish and take away at his own expense the houses and fences built by him on said land, unless the defendant decides to keep the same, in which latter event, and not otherwise, it is ordered, adjudged, and decreed that the defendant pay to the plaintiff $1,025 for the houses, and $75 for the fences, so kept; and that the said option be exercised and notified to the plaintiff within six months from the date of this judgment; otherwise the present judgment against defendant for the value of said houses and fences to become final on due proof made summarily in the district court of the nonexercise of the said option. It is further ordered, adjudged, and decreed that the defendant have judgment against plaintiff for the sum of $400, representing the rents and revenues of said land for the year 1902—in case, only, however, the same has been collected by the plaintiff. Plaintiff to pay the costs in both courts.

BLANCHARD, J., concurs in the decree. BREAUX, J., dissents.

### On Application for Rehearing.

(Feb. 2, 1903.)

PER CURIAM. A re-examination of this case has not led to a result different, on the main demand, from that announced in the former opinion of the court.

In other respects, as will hereafter appear, there should be a modification of the opinion and decree of the court.

Defendant board was created by Act No. 89 of 1892, the ninth section of which granted to it the lands within the limits of the levee district belonging at the time to the state, or which might thereafter be acquired by the state within such limits; but by the terms of said ninth section this grant was not to become operative until formal act of conveyance of the lands so donated shall have been made to the levee board by the

auditor of the State and the Register of the State Land Office.

Thus the section provides:

"It shall be the duty of the Auditor and Registrar of the State Land Office, on behalf of and in the name of the state, to convey to the said board of levee commissioners, by proper instrument of conveyance, *all lands hereby granted or intended to be granted and conveyed* to the said board whenever from time to time, the said Auditor and Registrar of the State Land Office, or either of them, shall be requested to do so by the said board of levee commissioners, or by the president thereof, and thereafter the said president of the said board shall cause the said conveyance to be properly recorded in the recorder's office of the respective parishes wherein the said lands are located, *and when the said conveyances are so recorded the title to the said lands, with the possession thereof, shall from thenceforth vest absolutely in the said board of commissioners, its successors, or grantees.*" (Italics ours.)

It will be thus seen the intention of the act was and is that neither the title to, nor the possession of, the lands donated was actually to vest in the levee board until the state officials mentioned, to wit, the Auditor and Register of the Land Office, shall have acted in the way the statute directs, by making formal conveyance to the board, describing the lands; and only when this is done, and the act of conveyance duly inscribed in the conveyance records of the parish, was title and possession to the land so conveyed absolutely to vest in the board.

Now, the Auditor of the State and the Register of the State Land Office did not execute formal conveyance of the lands in question in this suit to the board until April, 1901. So that the board's title and right of possession began only from that date. Nor did the Auditor and Register, in the act of conveyance so made at the time mentioned, assume to transfer to the board the right the state may have then had to collect from the plaintiffs rents for their possession and use of the land.

The levee board, therefore, is entitled to claim from McDade and his coplaintiffs rents for the year 1901 only, and years subsequent thereto.

The evidence is that 80 acres of the land was in cultivation in 1901, and that, including the use of the houses and fences upon the 80 acres, the rental value of the land was, that year, $5 per acre.

But the houses and fences were put there by plaintiffs, and were their property. This being so, the rent of the land, excluding the houses, cannot be figured beyond (say) $4 per acre, or $320 for the year 1901.

Plaintiffs insist that the cost of clearing this 80 acres of land was much more than $10 per acre, which was the allowance of the court. But in view of the fact that they (plaintiffs) are shown to have had the actual use of the land for several years before the Auditor and Register conveyed title to the levee board, and while the title was yet in the state, and that they cultivated the same, and enjoyed the fruits and revenues thereof, and have not been, and are not likely to be, called on by the state for rents while they so occupied and used it, they are not in a position to claim more than the allowance of $10 per acre.

Under the circumstances, it is questionable, indeed, whether they should be allowed anything under this head. But in a spirit of liberality the court stands by its former allowance of $10 per acre.

This makes $800 due the plaintiffs under this head, on which is to be credited the $320 due defendant board as the rent of the 80 acres for 1901, and a like sum for the year 1902.

After the state had, by Act No. 89 of 1892, declared its purpose of donating the lands it owned within the limits of the Bossier levee district to the board of commissioners of said levee district, for the use and benefit of the district, it was not competent for the plaintiffs to acquire any rights in and to any portion of the lands so belonging to the state, and included within the limits of the district, under the terms of Act No. 21 of 1886, granting pre-emption rights to actual settlers; and their going upon the lands in question, under the circumstances, is held to have been in bad faith.

In view of the foregoing, it is ordered that the decree heretofore rendered herein by this court be set aside, and in lieu thereof the following decree be and is hereby made the judgment of the court, to wit:

It is ordered and adjudged that the judgment appealed from be set aside; that the defendant board be recognized as the owner of the land in controversy, and sent into possession thereof; that a writ of possession do issue; that defendant board do have and recover of the plaintiffs $320 as rent for 80 acres of the land in controversy for the year 1901, and the like sum for the year 1902, with reservation of its right to claim rents for 1903, or so long as plaintiffs are permitted to remain in possession; that the demand of the plaintiffs to be reimbursed the cost of clearing 80 acres of the land in controversy be recognized and enforced to the extent of $10 per acre, or $800 in all; that plaintiffs be, and are hereby, directed to take away or demolish, at their expense, the houses and fences built by them on the land in controversy, unless defendant board decides to keep the same, in which event, and not otherwise, it is ordered that defendant pay to the plaintiffs $1,025 for the houses, and $75. for the fences, on the land; and that said option be exercised and notified to the plaintiffs within six months of the date of this judgment; otherwise the present award against the defendant board for the value of said houses and fences to become final on due proof made summarily in the court a qua of the nonexercise of the said option.

It is further ordered, etc., that plaintiffs pay the costs of this litigation in both courts, and that the rehearing applied for be denied.