709 So.2d 953 (1998)
KING'S FARM, INC., Plaintiff-Appellee,
v.
CONCORDIA PARISH POLICE JURY, Defendant-Appellant.
No. 97-1056.
Court of Appeal of Louisiana, Third Circuit.
March 6, 1998.
Rehearing Denied April 28, 1998.
*954 Virgil Russell Purvis, Jr., Jonesville, for King's Farm, Inc.
Madeline Cross Gibbs, Asst. Dist. Atty., for Concordia Parish Police Jury.
Before YELVERTON, THIBODEAUX and PETERS, JJ.
YELVERTON, Judge.
This appeal is from an action brought by King's Farm, Inc. (King's Farm) to have a boundary between properties owned by it and the Concordia Parish Police Jury judicially determined. The land in dispute is a 105.78 acre tract of land situated in Township 7 North, Range 7 East (T7N-R7E), Concordia Parish, Louisiana. Black Lake, stipulated by the parties to have always been non-navigable, encloses several hundred acres within its meander lines as shown on the Government Land Office Township Map of 1842. The land in dispute is on the north bank of Black Lake. King's Farm owns 110.90 acres in the northeast corner of Section 14 of the township down to the meander line of the lake. There is some considerable distance between the meander line of the lake, as shown on old government surveys, and the north shore of the lake itself. Between the meander line and the north shore line there is a strip of land across Section 14 containing an area approaching 200 acres. The eastern 105.78 acres of that strip is the land in dispute. It was stipulated that the police jury owns Black Lake, the property to the south of the land in dispute. The trial court held that the boundary should be set on the southern boundary of the land in dispute, thus ruling in favor of King's Farm. The police jury appeals. We reverse and render judgment in favor of the police jury fixing the boundary as the north meander line of Black Lake as shown on the government township map of 1842.
We will use an enlarged tracing of Section 14 as shown on the 1842 township map to show approximately where the disputed area is. We do this solely for the benefit of the reader's better understanding of the problem. The 1842 map reflects an 1838 subdivision by the government of the public land, or upland of Section 14, into five lots. Four of these lots, numbers 1, 2, 3, and 4, lie across the north portion of Section 14 north of Black Lake. These lots contain 213.9 acres. Lot 5 lies to the southwest, across Black Lake, in the extreme southwest corner of Section 14. It contains 7.1 acres. Our tracing of Section 14 from the 1842 survey depicts these lots and the acreage of each. Using King's Farm's Exhibit No. 1, a survey of the disputed area, we have drawn in, for illustrative purposes only, an outline of the disputed area represented by dash lines on the west and south sides, the meander line on the north, and the section line on the east:
*955 

Boundary Action
King's Farm contends that it has been in possession of the 105.78 acre disputed area since only as recently as 1992, when it acquired Lots 1 and 2 of Section 14 to the north of the disputed area. King's Farm does not seriously claim title. The police jury claims ownership under a title going back to 1853 under a patent from the United States which, by the formalities proclaimed by patents, recognized the separation of the property from the public domain.
The precise issue is whether the police jury proved ownership of the land in dispute in this boundary action. In a boundary action, the court must fix the boundary according to the ownership of the parties. La.Civ.Code art. 792. If neither party proves ownership, the court must fix the boundary according to possession. Id. A political subdivision of the state, including a police jury, cannot acquire property through acquisitive prescription. Parish of Jefferson v. Bonnabel Properties, 620 So.2d 1168 (La. 1993). Thus, for a court to fix the boundary in favor of a police jury, it must find that the police jury has proved ownership of the property within the boundary. When both parties rely on titles only, the boundary shall be fixed according to titles. La.Civ.Code art. 793. When the parties trace their titles to a common author preference shall be given to *956 the more ancient title. Id. In a boundary action, "[a] party that proves ownership by an unbroken chain of transfers from a previous owner or by virtue from a more ancient title from a common author prevails, unless the adverse party proves ownership by acquisitive prescription." Yiannopoulos, Property, § 268 in 2 La.Civ.L. Treatise 527 (3rd ed. 1991). A patent regularly issued by the government is the best and only perfect title. Young v. Miller, 125 So.2d 257 (La.App. 3 Cir.1960). In this case the police jury claims to have acquired ownership through an unbroken chain of title going back to the separation of the property from the public domain.
The trial court found that the land in dispute was not a part of Section 14 in T7N-R7E and, therefore, was not included in the police jury's title. As we will explain, this finding of fact was clear error because the public records reveal that the police jury became the owner of all but 7.1 acres of Section 14 of the township by a title traceable to the patent and that its ownership includes the land in dispute.
The trial judge also found that King's Farm had failed to establish ownership to the land in dispute either through title or acquisitive prescription of thirty years, but that it had established facts sufficient to prove actual possession of the disputed property for over one year, i.e., since its acquisition of the property north of it in 1992. The trial court therefore fixed the boundary according to King's Farm's possession, which was to the southern boundary of the land in dispute, the southern boundary being the water's edge of Black Lake.
The trial court's finding that King's Farm did not prove ownership of the disputed strip is correct, and that is not an issue before us. Because of our resolution of this case in favor of the police jury, King's Farm's possession is not an issue either, and we will not discuss it.

The Police Jury's Title Chain
It is axiomatic that titles are based on public records, and according to the public records of Concordia Parish, the police jury's title begins with a patent from the United States issued to Thomas Curry and Rice Garland on October 1, 1853. The patent was based upon a confirmation judgment granted Curry & Garland by the United States District Court for the District of Louisiana in 1846. Their title was confirmed to land conveyed, under a Spanish Grant to Louis Bringier, before the Louisiana Purchase. The patent was based on a survey, and the land included nearly all of T7N-R7E and all of Section 14 of that township. The property recognized in the patent was meticulously described both in arpents and in acres. Other parties acquired undivided interests in the Bringier Grant, and on July 10, 1855, the Bringier land was sold at a sale by licitation to effectuate a partition. The Estate of William C. Micou, one of the co-owners, was the purchaser out of T7N-R7E of "All of section fourteen in the same township & range (except a small fraction in the South West corner) containing Six hundred & thirty-two 90/100 acres."
On November 11, 1856, the Estate of William Micou conveyed out "of Township Seven, Range Seven East ... all of Section Fourteen in the same Township and Range (except seven 10/100 in the South West corner thereof) containing Six hundred and thirty-two 90/100 at the price of Nineteen hundred and Sixty Seven dollars for the Section." The conveyance was to the Police Jury of Concordia, and it is recorded in Conveyance Book N at page 87 of the public records of Concordia Parish.
Retired Judge W.C. Falkenheiner testified at the trial of this case as an expert for the police jury. It was stipulated that he was an expert title examiner (not, as referred to in King's Farm's brief, an expert title abstractor). He testified that during the 1950s, before he was elected to the bench, he represented oil companies which leased this property from the police jury for oil and gas exploration and that he became very familiar with the property at that time. After retiring from the bench, he did further legal work involving the property. He reviewed some 21 exhibits in evidence which constitute the chain of title.
*957 Judge Falkenheiner was the only expert in title examinations to testify in the case. His qualifications as an expert were never disputed. We have carefully reviewed the exhibits constituting the chain of title, and we find that Judge Falkenheiner correctly interpreted the public records and was correct in his legal opinion that the police jury is the record owner of this property today.
Judge Falkenheiner explained this chain and stated that when the police jury acquired the property, it acquired all of Section 14 as shown on an 1842 government survey of the township. The only exception was 7.1 acres in the southwest quarter. Its acquisition by conveyance was stated in the deed to be 632.9 acres. This township plat shows two big geographical features named Cypress Brake and Black Lake. As to Section 14, the 1842 plat shows 221 acres of public land consisting of a subdivision creating Lots 1 and 2 of the fractional Northeast Quarter, Lots 3 and 4 of the fractional Northwest Quarter, and the 7.1 acre Lot 5 in the Southwest Quarter. Judge Falkenheiner interpreted the dimensions of Section 14 on the plat to be a regular section containing 640 acres. He compared Section 14 containing Black Lake to other parts of the township plat, notably the sections containing Cypress Brake, which was also part of his title examination in the 1950s, and noted that the drafters of the 1842 plat treated the Cypress Brake sections the same, i.e., the areas of the brake and the lake were encompassed in the section lines where they lay.
Thereafter, the police jury made two sales of the upland portions of Section 14. One sale was a "fractional" North Quarter sold to the authors in title of Fisher Lumber Company, containing 110.9 acres. Although the police jury did not convey it as Lots 1 and 2, the conveyance was of the exact same acreage as Lots 1 and 2, and it is clear that that was the property actually sold. Later the police jury sold the "fractional Northwest Quarter," which subsequent documents in the chain reflected were Lots 3 and 4. We will mention the first of these two sales again under our discussion of King's Farm's title chain because the police jury, obviously, was one of King's Farm's ancestors in title.
These were the basic outlines upon which Judge Falkenheiner testified. It was his opinion that the public records indicated the police jury had acquired in private ownership the entire Section 14, except for 7.1 acres, that the section contained 640 acres more or less, and that after the sales in 1952 the police jury has continued to own approximately 420 acres (actually 419).
Judge Falkenheiner also testified that the Micou deed was the source of the police jury's ownership of considerable acreage in Concordia Parish, much more than the acreage involved in this case. We reiterate that the Micou deed is also in the chain of King's Farm's title to Lots 1 and 2.

King's Farm, Inc.'s Title Chain
King's Farm's ancestor in title is the police jury. Its title derives from a number of conveyances beginning with one dated January 20, 1858, when the police jury conveyed to John G. Neelly, executor of the Stacy estate, "land situated ... in the Parish of Concordia, being the East half of Section Eleven, and North fractional quarter of Section Fourteen, township Seven, Range Seven East containing in all [431.90] acres...." Half of Section 11 is 341 acres according to the 1842 government survey. This sale translates to 110.9 acres of Section 14. Through a series of transactions the same property, but described as "the fractional Northeast quarter of Section 14," passed to Richard H. Malone, receiver for Fidelity Savings Association. This was in 1904. In 1908, Cliff Walker purchased the "fractional NE1/4" of section 14. The deed stated that the land contained 110.90 acres. The property was described the same when purchased by George Balch in 1909. In 1910 the Tensas River Lumber Co. purchased what was described as Lots 1 and 2 of Section 14, T7N-R7E, still stated as containing 110.90 acres. With the same description, the property passed through several transfers to the Fisher Lumber Corporation in 1926. On February 22, 1991, by an act of exchange, the Resource and Land Partnership acquired ownership of what was by that time described merely as Lots 1 and 2 of Section 14 in T7N-R7E. The same was purchased by *958 Hal J. Scott on January 31, 1992. Finally, under the same description, King's Farm purchased the property from Scott on March 11, 1992. There is nothing in any of these sales that purports to transfer any land south of the meander line as clearly fixed on the government survey. The meander line of Black Lake is the same as the south boundary lines of Lots 1 and 2. King's Farm did not establish ownership of any land south of Lots 1 and 2.

Trial Court's ruling
In its reasons for judgment the trial court held that the Parish (Police Jury) had failed to prove ownership by title because "[t]he lands in dispute are not in Section 14, Township 7 NorthRange 7 East." We hold that this finding of fact was clearly wrong.
The thrust of King's Farm's argument to affirm the trial judge's ruling is that Section 14 consists of 221 acres and no more, and that more acreage than that in the area of Section 14, as shown on the 1842 map, never has and never can be separated from the public domain under a description referencing Section 14 because a greater-than-221-acre Section 14 simply does not exist. For this argument they use the technicality that the 1853 map replaced the 1842 map.
The fallacy of King's Farm's logomachy on "sections" can be demonstrated in two ways. First, the actual land that was once shown in this township as a typical 640 acre section and assigned the number 14 does indeed exist. One Hundred Five and 78/100ths acres of it is what the parties are quarreling about today. The other way that the fallacy can be demonstrated is by an understanding of the two government township maps of 1842 and 1853. The terms "meander line" and "public land" as shown on those maps are assigned different meanings by the parties in this case. It is our opinion that the true meaning and significance of these terms are apparent from a study of the surveys themselves. Moreover, our opinion is solidly supported by McDade v. Bossier Levee Board, 33 So. 628, 109 La. 625 (La.1902), which we will discuss later. Once "meander line" and "public land" are put in the proper perspective, it becomes clear that the 140-year chain of title and Judge Falkenheiner's title opinion establish ownership in the police jury. The land in dispute is in Section 14, and the police jury has established its ownership of that land.
We mention here what should be obvious: a boundary dispute presupposes that the contestants are claiming ownership of property on opposite sides of the questioned boundary. The trial judge recognized a stipulation that the police jury was the owner of the lake. So the fallacy of King's Farm's position is readily apparent in the inconsistency of its contention that the police jury cannot now own any acreage in Section 14. The report of Tooke Engineering, which the trial judge relied on in its reasons for judgment, suffers from the same inconsistency.[1]

The 1842 and 1853 Township Maps
According to the 1853 survey, which was approved by the office of the Surveyor General of Louisiana on March 19, 1853, T7N-R7E contains 22,797.92 acres. A township is 36 sections. A section contains 640 acres. A perfect township contains 23,040 acres. It is true, as testified by the surveyors in this case, that rarely is there a perfect section, but it is also true that most are pretty close and a few are on the dime. All 36 sections on the 1853 survey appear, by looking at them on the scale survey, to be uniform in size. The police jury's surveyor saw Section 14 as 640 acres.
On the legend of the 1842 survey there is a list of the township's 36 sections, and beside *959 each section there is the area in acreage described as "Contents of the Public Land." On the left side of the legend is the plat of the township and its 36 sections. Two large lowland areas, the larger Cypress Brake and the smaller Black Lake, stand out. Numerous other lowlands shown as rivers, bayous, and cane brakes, some with names and some without names, also appear on the map. It is very easy from a simple inspection of this survey to correlate the lowland features with the sections containing less "Public Land" than 640 acres. For example, almost the entirety of Section 21 is in Cypress Brake; an area of only 1.62 acres is listed in the legend by that section as "Public Land." Next to it is Section 22, less than half of which is in Cypress Brake, and it is listed as having 420.32 acres of "Public Land." The Tensas River cuts across Sections 2 and 3, reducing their area respectively to 598.43 and 573.90 acres of "Public Land." Similarly, and getting to the issue in this case, about two-thirds of Section 14 is engulfed by the meander line around Black Lake, leaving the northern third and a very small portion in the southwest corner, shown as a total of 221 acres in area, as "Public Land." The sections unaffected by these lowlandsSections 1, 5, 8, 9, 11, 12, 25, 30, 33, 34, 35, and 36are listed as full acreage sections and are all shown as "Public Land."
The township involved in this case is only 242.08 acres shy of containing an ideal 23,040 acres. Taking into account that the 12 sections totally unaffected by lowlands, all being listed as "public land," together comprise acreage of full 640 acre sections plus 40 acres, it is impossible, mathematically, for the 24 remaining sections to have greatly reduced acreage and still add up to 22,797.92 acres.
These observations and calculations clearly demonstrate that the reference to "Public Land" in the legend of the 1842 map distinguishes uplands from lowlands in the township. The list could not have been intended to limit the total acreage within each numbered section.
That the term "Public Land" as used on these maps cannot have the meaning assigned to it by King's Farm is further abundantly illustrated by the government survey of 1853. This survey of the township also contains a Legend described as Table of Contents, and it lists separately "Public Land" and "Private Claims." The total "Public Land" in the township is shown as 1,785.79 acres and consists of acreage in eight sections in the township. Every single acre shown as "Public Land" is upland. None of it is in Black Lake, Cypress Brake, Tensas River, or Black River. Under the heading "Private Claims" on that map it is shown that Curry & Garland, under L. Bringier, claimed 20,258.98 acres out of the township's total of 22,797.92 acres. This survey also makes reference to the United States District Court's rulings of May 2 and June 26, 1846, confirming the Spanish Grant, which rulings we know became the basis for the patent issued to Curry & Garland. The patent description clearly included the bed of Black Lake and all of the remainder of the 640 acre Section 14, T7N-R7E. The 1853 map done in connection with the patent grant of T7N-R7E to Curry & Garland showed the boundaries of the lands that had previously passed by grant from the United States to other persons. The map does not define the boundaries of all of the individual sections within the township, as did the 1842 survey. Instead, it shows one mega-section numbered 39, used to designate the township itself, containing 20,263.98 acres, and the 1,785.95 acres from regular sections 2, 3, 4, 10, 16, 24, 31, and 32, and two other parcels assigned numbers 37 and 38 claimed by John Henry, that had been subdivided into lots and conveyed as uplands to other persons by the United States. The "Public Land," together with Curry & Garland's land, and the claims of John Henry add up to the total acreage within T7N-R7E of 22,797.92 acres.
By the time of the United States patent there were several owners with undivided interests in the tract. William Micou was one of those. In dealing with the property, the co-owners took the practical step of using the 1842 government map, because of its grid and section lines, to facilitate descriptions. Without these description aids, descriptions would have been extremely complicated if not impossible.
*960 Section 14 as conveyed to the police jury from Micou contained 640 acres less 7.1 acres in the southwest corner. Any idea that it contained only 221 acres is refuted by both the description of the property as conveyed and the 1853 map accompanying the patent from the United States. Both the patent and the map accompanying it cover the entirety of the section outside and inside Black Lake. It is true that the 1853 map, which did not show all the sections, superseded the 1842 map which did. However, it is not true that the government surveyors intended thereby to make the land embraced by what had theretofore been designated Section 14, or the land under any other section, disappear. It is clear that the land theretofore embraced by Section 14 passed with the patent into the private ownership of Curry & Garland, then to Micou, then (except for 7.1 acres) to the police jury. Courts may not correct errors in official government surveys, but courts are completely competent to locate the lines of surveys on the ground and to locate any given tract of land in relation thereto. Texas Intern. Petro. v. Delacroix Corp., 94-1426 (La.App. 4 Cir. 1/31/95); 650 So.2d 815, writ denied, 95-0467 (La.4/21/95); 653 So.2d. 567.
In Louisiana a non-navigable lake is a private thing subject to ownership by private persons. La.Civ.Code art. 453; Shell Oil Co. v. Pitman, 476 So.2d 1031 (La.App. 3 Cir. 1985). The case of Hardin v. Jordan, 140 U.S. 371, 11 S.Ct. 808, 35 L.Ed. 428, (1891), held that patents by the United States of lands bounded by streams and other waters are to be construed, as to their effect, according to the law of the state in which the land lies. The case also explains "meander lines" and "public lands" appearing on surveys during the same time period a century and a half ago, which is when the plats before us were put together.
The plaintiff in McDade, 33 So. 628, 109 La. 625, raised an issue like King's Farm has done here, arguing that because the bed of a lake had not been surveyed in 1836, the lake did not pass to the state. We quote from that case the court's narration of the facts and response to that argument:
Township 16 N., range 12 W., N.W. district of Louisiana, in which the bed of this lake is situated, was duly and regularly surveyed under authority of the general government in 1836. The township and section corners were established, and the township and section lines were run, except that the latter were run only to the margin of the lake. The contour of the lake was meandered, and the meander points were marked by posts.
This survey was duly platted, and we have the map before us. The lake lies diagonally across the northeast corner of the township. It is about seven miles in length, by a width varying from a few acres to about a mile; its area being 1,077 1/7 acres. It does not cover any single section, but cuts off the corners of some, and passes through the bodies of others. The sections are all laid off as regular sections, except that the space occupied by the lake is left blanknot traversed by any lines.
....
The reason why the traverse of this lake was not surveyed, and its acreage ascertained, is fully explained by the remarks made by the Supreme Court of the United States in the case of Hardin v. Jordan, 140 U.S. [371] 380, 11 Sup.Ct. [808] 811, 35 L.Ed. 428 [(1891)]. Speaking of a similar survey, the court there said: `It has been the practice of the government, from its origin, in disposing of the public lands, to measure the price to be paid for them by the quantity of upland granted; no charge being made for the lands under the bed of the stream, or other body of water. The meander lines run along or near the margin of such waters are run for the purpose of ascertaining the exact quantity of the upland to be charged for, and not for the purpose of limiting the title of the grantee to such meander lines.'
The survey we are dealing with was made in 1836 ... at a time ... when the purpose of making the survey was to ascertain the area of the dry land; no reckoning at all being taken of the water-covered land, which passed to the future grantee or patentee as an accessory of the dry land. As observed by the court in the same case ([at] page 381, 140 U.S., [at] *961 page 811, 11 Sup.Ct., 35 L.Ed. 428): `It has never been held that the lands under water in front of such grants are reserved to the United States, or that they can be afterwards granted out to other persons, to the injury of the original grantees.'
....
Not having ascertained the acreage of the lake, the surveyor naturally left this acreage out of his computation of the acreage of the sections bordering on the lake, and as naturally the sections and their acreage were put in the selection list in accordance with the survey (that is, minus the acreage of the lake), and the list was approved as made. Plaintiff contends that the effect of this was that not the entire sections passed to the state, but only the acreage specified as their contents, and that the water-covered area passed, if at all, only as an accessory to the dry land, and that, if so, it also passed to his authors in the same way when the state conveyed to them the same dry land.
Id., 33 So. at 629-630.
The Louisiana Supreme Court rejected the plaintiffs' contention in that case, and we reject the plaintiff's similar contention in this case. What passed in the patent was all 640 acres of Section 14, both upland and lowlands, and the police jury is today the owner of 419 acres of it, including the 105.78 acres in dispute.

Summary of Where the Boundary is
The place where we will fix the boundary, which is the southern boundary line of Lots 1 and 2 of Section 14, has been consistently marked on the ground and mapped on surveys. It is the meander line of Black Lake.
The police jury, as owner of 632.9 acres (all but the 7.1 acres in the southwest corner) in Section 14, acquired from the Micou estate, first sold the upland portions, as we described earlier, retaining 419 acres. These sales correctly described the conveyances as "fractional Northwest quarter" and "fractional Northeast quarter" of Section 14, T7N-R7E. In the sale from Fisher Lumber Co. to Resource and Land Partnership in 1991, the descriptions finally dropped the acreage references and described the sales only as Lots 1 and 2 in Section 14, Township 7 North, Range 7 East. Never in the public records are Lots 1 and 2 described in relationship to Black Lake. The lake is never mentioned in any document. The meander line is the boundary of the lots.
The police jury has historically dealt extensively with the land in dispute and the remainder of its 419 acres in Section 14. It has leased its mineral rights in the section to oil companies. These dealings were publicized in the official journal of the parish, the Concordia Sentinel, and in the Baton Rouge State Times. The minutes of meetings of the police jury recording these activities, and copies of the recorded oil and gas leases themselves, are in evidence. The police jury has never excluded the public access to the surface and has encouraged the public to hunt freely on the land.
In 1959 the then owner of Lots 1 and 2, Fisher Lumber Company, made a survey of the two lots. The southern boundary was marked on the survey and painted by employees of Fisher Lumber Company. Ray Adams, a senior forester and resident representative of the company, testified that after the boundary was determined, no activities were conducted by the company south of that boundary. There are title opinions in the record rendered by attorneys years ago recognizing the survey and the fact that it established the southern boundary of Lots 1 and 2. After he retired, Adams went back on the property in 1992 as a consultant for Fisher Lumber Company and stated that the boundary was still clearly visible. It was also clearly visible in 1995 to Lee Jones, a registered forester who testified that he examined the property in that year. Not only was the boundary painted, but there were witness trees, tenpenny nails, and concrete corner monuments marking it. Mark Tooke, the surveyor, testified that he found every mark, monument, and witness tree that had been put there in 1959 by the surveyor for Fisher Lumber Company. He also found the yellow paint, in addition to the monuments, along the meander line. The evidence clearly demonstrates that the boundary had been marked, surveyed, and established along the *962 south boundary line of Lots 1 and 2, which is the same line as the north meander line of Black Lake, and that that boundary has been honored as far back as any record reveals.
For the foregoing reasons the judgment of the trial court is reversed, and judgment is rendered ORDERING that the boundary between the parties in this action be and it is hereby fixed as is shown on "Map of Portion of Resource and Land Partnership Lands (Fisher Lumber Corp. Lands) Situated in Sections 1, 2, 11, 12, 13, & 14, T7NR7E, Sections 7 & 18, T7NR8E., Concordia Parish, Louisiana, by Malcolm G. Barlow, Registered Land Surveyor," dated January 1992, described as follows:
Commencing at the Northeast corner of Section 14, T7N-R7E, Concordia Parish, Louisiana, run S 0 degrees 12' E, 1352.02 feet to a 100 d/n found in place at the POINT OF BEGINNING; THEN RUN S 46 degrees 10' W, 415.64 feet to a 100 d/n found in place; THEN RUN S 70 degrees 04' W, 660.01 feet to a 100 d/n found in place; THEN RUN S 82 degrees 03' W, 1121.48 feet to a 100 d/n found in place; THEN RUN N 89 degrees 56' W, 616.63 feet to a 100 d/n found in place.
Costs of court both here and below will be paid by King's Farm, Inc.
REVERSED AND RENDERED.
NOTES
[1] The finding of the trial court that the disputed area is not in Section 14 is based on a "REPORT" of Tooke Engineering attached to a plat of survey it prepared in 1995. In the trial court's Reasons for Judgment it quoted two paragraphs from that report. In the first paragraph, the surveyor expressed the opinion that the 19th Century government surveys showed Black Lake was "apparently" part of the public domain and was "not to be severed to the public." The second paragraph, which appears to contradict the first one, gives Tooke's interpretation of turn-of-the-century letters from the government land office (which are not part of the chain of title and not in the record) to mean that all of Section 14 had passed to private owners and therefore could not be claimed by the State of Louisiana under the Swamplands Act of 1849.