Statement of the Case.
MONROE, J.
Plaintiff is a public corporation, and was created for the purpose of draining the district (whose name it bears) lying in the western part, and extending from the northern boundary of, the parish of Iberia to Vermilion Bay, into which it drains. The district is traversed from west to east by defendant’s railroad, and there is a watershed of some 25,000 or 30,000 acres of land to the north of the railroad, which must drain under, over, or through the right of way. The main natural drain is Bayou Petit Anse, which enters the district from the parish of Lafayette on the north, and flows in a general southwesterly direction. More than 100 years ago the greater proportion of the waters of the bayou were deflected at a point, as we take it, a little above that at which the railroad now crosses into a local drain, known since then as Coulee Hayes, and from a period beyond the memory of man CoulSe Hayes has been the main channel of the bayou from the point mentioned down to the Salt Mine Canal (originally constructed by the Spanish commandante), which carries its waters into Vermilion Bay. In periods of high water, however, the entire “platin” (or low ground) between the bayou and the coulee (say 1,000 or 1,200 feet in width at the railroad crossing) serves as a drain, though we infer that since the building of the railroad (15 years ago) some filling has been done which may separate the two streams at the crossing even in high water. The railroad company has a bridge (as it is called, though it appears to us to be merely a trestle) known as “8 A,” 345 feet long, over the coulee, and another, known as “S B,” 150 feet long, over the bayou. The situation, so far as it need be shown for the purposes of this case, is roughly represented by the subjoined “sketch,” which, making no pretensions to absolute accuracy, has been prepared from a number of sketches offered in evidence, no' two of which are altogether alike. In accordance with a scheme of drainage proposed by plaintiff and approved by the board of state engineers, and which contemplates *505 the opening, and incidentally, perhaps, the widening, deepening, and straightening, of the natural drains, plaintiff started its dredge boat into Coulée Hayes from the Salt Mine Canal and worked up stream until it reached defendant’s bridge “8 A,” which obstructed the further passage of the boat. Defendant was thereupon appealed to, and, through its representative, expressed itself, in civil terms, as being willing to facilitate the work. It, however, did nothing, save to carry on negotiations and correspondence, which lasted several months, during which time, or part of which time plaintiff’s contractor was delayed and the dredge boat was kept idle below the bridge. Plaintiff’s engineer suggested that the most feasible, if not the only, thing to be done was to open the bridge and let the boat go through, and no better or other plan was suggested by defendant; the only question upon which the parties were really unable to agree. being who should bear the expense of removing and restoring so much of the bridge (or trestle) as it might be necessary to remove for the passage of the boat. Plaintiff finally offered. to make a deposit of $2,500 (which appears to have been sufficient) by way of security, and leave the question of liability to be settled by the courts, but defendant for some reason not explained would not accept the offer. There was, then, some talk, of plaintiff’s forcing a passage, and defendant obtained a writ of injunction restraining it from disturbing the bridge over Bayou Petit Anse. Plaintiff was not interested, however, In the bridge (8 B) over Bayou Petit Anse proper, but was obstructed by the bridge (8 A) over Coulée Hayes, and it also went into court, and, alleging the obstruction (though it, like defendant, designated the bridge over Bayou Petit Anse as the one in which it was interested), obtained ex parte an injunction enjoining and commanding defendant to “desist and abstain from opposing, obstructing, impeding, or interfering with the work of dredging in Bayou Petit Anse, herein above described, and, in default of defendant’s removing the crossing within 24 hours,” directing that it be removed by the sheriff.
It may be here stated that the petition further alleges as follows:
“Your petitioners further show that at this time it is simply their desire to cross the said railroad track with the dredge boat in order to continue their work of dredging, but they reserve their right to compel and to force the said railroad company hereafter to span the said Bayou Petit Anse with a railroad bridge which will meet the requirements of the board, and not interfere with the drainage of the district”
—and the right of plaintiff to claim damages was reserved.
When defendant learned of the issuance of the writ so obtained, it appealed to this court for a writ of prohibition, and a rule nisi was issued with the usual restraining order, but, before the papers could be served, the delay allowed by the district court had expired and the trestle (8 A, over Coulée Hayes) had been in part removed, and the dredge boat had passed. This court, however, proceeded to consider the case as presented by the petition of defendant and the returns, and rendered judgment, prohibiting further action under the mandatory injunction (obtained by plaintiff) until defendant should have been heard. Board v. Railroad Company, 117 La. 940, 42 South. 433. Thereafter defendant appeared in the district court, and made answer, in substance, as follows:
It alleges that its road is built upon land owned by it, including the beds of Bayou Petit Anse and Coulée Hayes. It denies that plaintiff has acquired any rights over the same, and admits “positively refusing to allow any dredge boat to pass through said property, or to allow other entry thereon.” It alleges that plaintiff, under color of the mandatory injunction, caused the bridge over *507 Coulée Hayes to be destroyed, and, further trespassing, caused its contractor to dredge a canal through defendant’s right of way to a depth below tide level and to a width exceeding that of the coulée.
“Defendant admits that said Bayou Petit Anse, which is some distance west of said Coulée Hayes bridge and said canal, is the natural drain of the lands of the Petit Anse Coteau drainage district, but shows: That plaintiff is now purposely making said canal a substitute therefor, and is making said canal the^ main drain of the lands of said drainage district. That above respondent’s said land and railroad plaintiff is intentionally directing all the waters of the said bayou and of said land into said canal, and is thus changing their natural course, and is artificially causing same to flow upon, and over, respondent’s land at said Coulée I-Iayes bridge. That plaintiff is draining, or about to drain, into said canal, above said bridge, by cutting through watersheds, lands which naturally drain in wholly different directions. That in these and other ways plaintiff is both imposing new burdens on respondent’s said land at Coulée Hayes bridge, and is rendering more burdensome any natural servitude of drain which may be owing by said land, though none is admitted to be due.”
Defendant denies that the acts and claims of plaintiff are authorized by Act No. 259 of 1898 (meaning No. 159, p. 293, of 1902), and alleges that, if it be otherwise held, said act contravenes articles 2 and 1G7 of the state Constitution and the fourteenth amendment of the Constitution of the United States. It denies that plaintiff has any right to enter upon its land, and alleges that, in any event, it could do so only after expropriation by judicial proceedings and compensation first made; denies that the canal through and above its lands was cut along any channel selected by the drainage district and approved by the board of state engineers, and denies that it is a public drainage canal, or that plaintiff has control of it; and it alleges that the acts complained of have caused it great loss and injury, for which it reserves the right to claim damages.
“Wherefore respondent prays that plaintiff’s demand be rejected, and that, in so far as it may be necessary, in view of the decree of the Supreme Court, making peremptory said writs of certiorari and prohibition, the said writ of mandatory injunction herein issued be decreed to have issued illegally and without due process of law, and be set aside and dissolved; also, that there be judgment recognizing the land forming respondent’s right of way at said Coulée Hayes bridge to belong in full ownership to this respondent, and decreeing that said plaintiff corporation is without right to enter upon defendant’s said property or exercise any functions thereon ; further, that respondent have judgment decreeing illegal and tortious all of said acts of plaintiff, including its entries through said sheriff, as well as through its agents, and said dredging on the said property of respondent, the destruction of said bridge and other property, the creating of burdens thereon, as well as the increasing the burden of any servitude which may have previously been due by said land, though none such is admitted; further, that there be judgment requiring the said plaintiff within a delay not exceeding 30 days from the date of the judgment herein to refill the said excavation, dredged by it through defendant’s land at Coulée Hayes, in such manner and to such extent as to restore said Coulée Hayes, through respondent’s land, to a width and depth not less than it properly had prior to the said excavation and wrongful acts, and requiring plaintiff within 30 days from date of said judgment to dam and obstruct said canal above respondent’s said land at Coulée I-Iayes bridge; and that in the event of plaintiff’s not complying with the requirements as above prayed, or with the requirements of whatever judgment may be rendered against it within said time, then that this respondent shall be authorized by said judgment to refill said excavation, after said time shall have elapsed, to said extent and to cause said works to be constructed and to protect the property from said increased flow of waters, and to recover from plaintiff and the surety on the injunction bond herein given, all expenses thus incurred.”
Upon the trial in the district court it was shown that the original channel of Bayou Petit Anse is obstructed by the piles, which support defendant’s trestle, and by silt and debris, which has lodged against them, and that for a mile or more below the trestle, until it almost loses itself in the swamp, it is exceedingly tortious and is obstructed by growing trees, fallen timber, silt, etc., the evidence satisfying us that the main channel through Coulée Hayes (which is also called Bayou Petit Anse) was wisely selected for plaintiff’s purposes. It was shown that Coulée Hayes required dredging; that it was necessary, in the doing of that work, that plaintiff’s dredge boat should pass defend *509 ant’s bridge “8 A”; and that the method proposed and adopted for the passage of the boat was the most feasible and subjected defendant to as little inconvenience as any that could have been adopted. It was shown that the coulée was obstructed by the piles which supported the bridge and by other piles which had supported a pre-existing bridge, and which had been sawed off beneath the surface of the water; that it was dredged to a somewhat greater depth and width beneath the bridge and across defendant’s right of way than existed prior to the dredging; and that, after passing the right of way going north, plaintiff, instead of following the coulée into the bayou, and then around the arc to the point, G (as indicated by the sketch), cut a channel (or canal) along the chord of the circle, thus making its drain straighter and necessarily shorter. The evidence fails to show that, as a consequence of the work thus done any more or other water will be attracted into the coulee, at the railroad crossing than would naturally flow there without such work, the most that can be said upon the subject being that, by reason of its increased capacity, the coulée will hold and 'carry off more water at one time than it did before, that the drainage will therefore be more rapid, and hence more effective, and that the tendency in high water to an overflow of the entire “platin” lying between the coulée and the bayou will be reduced. Bayou Petit Anse and Coulee Hayes are not navigable streams, and titles to land in that vicinity ignore the coulée and refer to the bayou as a boundary. We take it that defendant is the owner of the soil constituting the beds of both streams, subject, however, to such conditions as the law imposes with respect to the servitude of drain and to such authority as is legally vested in the police jury or the board of commissioners of the drainage district.
There was judgment in .the district court in favor of plaintiff maintaining its injunction, and defendant has appealed.
Opinion.
Prior to 1888 the state of Louisiana had paid but little attention to what may be called public drainage (as contradistinguished from such drainage as affected only the interests of particular individuals). The Revised Civil Code contained certain articles (now article 060 et seq.) under the subtitle, “Of servitudes which originate from the natural situation of places” and others (now article 772 et seq.), under the title, “Of conventional, or voluntary, servitudes,” and the subtitle, “Of the rights of the proprietor of the estate to which (he servitude is due.” Article 660 provides that the “estate situated below” is bound to receive the waters which run naturally from the estate above, provided the industry of man has not been used to create the servitude; that the proprietor of the lower estate shall do nothing to prevent this running of the water, and that the proprietor of the upper estate shall do nothing whereby the natural servitude due by the lower estate shall be rendered more burdensome. Articles 772, 773, and 774 provide that he to whom the (conventional) servitude is due shall have the right to make the necessary works for its preservation, and that he may go on the debt- or estate and construct or repair such works at his own expense. And there are some other provisions under both the titles mentioned which need not be more particularly referred to.
The only other legislation upon the subject was an act of 1813 (now contained in the Revised Statutes as section 2743), which confers upon the police juries the power “to cause to be opened, in any town, suburb, or other place, divided into house lots, or, when a point of land, on the Mississippi river or other water course, shall be divided among several proprietors, such ancient, natural, *511 drains as have been obstructed by the owners of the adjacent lands, and to prescribe the mode to be observed in that respect” (the right being saved by an act of 1814 to the proprietors to make their complaints, if any they should have), and an act of 1858 (now ■contained in the Revised Statutes as section 2750), which confers upon the police juries the power “to pass all such ordinances as they may deem necessary, relative to roads, bridges and ditches, and to impose such fines and penalties to enforce the same, as they may think proper.” The interpretation of article 660 has been broadened as compared to that originally placed on it, and, by the more recent decisions of this court, it has been held that the owner of the estate to which the servitude is due is not prevented from clearing his land and fitting it for cultivation by digging proper ditches and canals, whereby the running waters may be concentrated and their flow increased beyond the .slow movement by which they would ultimately reach the same destination. Sowers & Jamison v. Shift et al., 15 La. Ann. 300; Guesnard v. Executor of Bird, 33 La. Ann. 796; Ludeling v. Stubbs, 34 La. Ann. 935. Upon the other hand, it has been held that article 772 e.t seq. apply only to conventional servitudes, and that the owner of the upper estate, claiming under article C60, “is not entitled to enter, at pleasure, on the contiguous tract, without the consent of its owner, whenever it may be necessary to remove any obstruction to the enjoyment of the servitude, nor, can he widen the drain by which the waters are carried off.”
The case from the syllabus of which the foregoing excerpt is taken was decided in 1848, and the court proceeded to say (quoting from the opinion):
“This improvement [the widening of the drain] if necessary, can alone be made by the police jury upon an adequate compensation to the defendant for the damage he may sustain thereby.” Landry et al. v. McCall, 3 La. Ann. 134.
There was at that time no law under which the police jury could have taken the action suggested, their power, with respect to drainage, being confined to the opening of ancient drains on property divided into house lots and upon points of land on the Mississippi and other streams and to drainage immediately 'affecting the public roads, etc., under their .control. Parish of Concordia v. Railroad Co., 44 La. Ann. 613, 10 South. 809. In so far, however, as that power went, it has been recognized as what is called a “police power.” Thus in May v. Ransom, 5 La. Ann. 425, after referring to the difficulty encountered in construing Rev. Civ. Code, art. 660, this court said:
“To obviate this difficulty, the Code of Prance provides that courts of justice are to decide in such manner as to reconcile the respect due to property with the interest of agriculture. This discretion is not expressly given to us. But more ample and beneficent powers on this subject have been vested elsewhere by the Legislature.”
And, the case being one concerning ancient drains upon a point on the Mississippi river, the opinion proceeds to call attention to powers with respect thereto conferred by the act of 1813 on the police juries. And so in Walsh v. Arnous, 6 La. Ann. 98, it was said:
“In dismissing the petition, we again repeat what we stated in Ransom’s Case, that ample powers to settle this controversy to the advantage of both parties are vested in the police jury by the act of 1813.' * * * Police juries have the exclusive right under the law to determine how lands situated within the points on the Mississippi river shall be drained, without regard to their relative positions, as superior or inferior estates, and to apportion among the several proprietors the cost of the drainage.”
In 1888 “Ransom’s” (or “Rancon’s”) Case was again referred to in a controversy between the successors in title of the parties to that litigation, as follows, to wit:
“This question of drainage has been a mooted one between the proprietors of Glendale and Gold Mine plantations for a great many years, and in 1850 * * * there was a litigation between Thomas May and Norbet Rancon, the ob *513 ject of which was to coerce the drainage of Bonnet Carre point and Gold Mine over Glendale. * * * As a means of solving the difficulty presented the court took occasion to recommend the parties to seek relief under the act of March 25, 1813. * * * That decision was rendered in 1850, and it was in pursuance of the recommendation by the court that the police jury ordained and established company canal. * * * In Avery v. Police Jury of Iberville, 12 Da. Ann. 554, the court upheld the constitutionality of the act of 1813. * * * There was a clause in the act of March 3, 1S14, which is explanatory of section 6 of the act of 1813, saving to persons aggrieved the right of complaining _ of the making or opening of such natural drains when * * * hurtful to them before any court of competent jurisdiction as in case of a common civil action. * * * The judge a quo held ‘that, the servitude having been established under the police power of the parish authorities, the control of the common canal or ditch known as the “Company Canal” still remains in the police jury; that neither can the defendant prevent or oppose the dredging or cleaning of any portion of the canal through which the servitude has been established, nor can the plaintiff or other individuals go at their pleasure on defendant’s land without its consent for the purpose of dredging or improving the condition of the drainage canal; and that such improvements must be done by order of the police jury on such terms and in such manner as they may think proper.’ These observations are eminently wise and correct, and should be enforced.”
And the judgment appealed from was accordingly affirmed. Sarpy et al. v. Hymel et al., 40 La. Ann. 425, 4 South. 439.
A few months after the decision thus quoted was rendered, the General Assembly deemed it advisable in the public interest to broaden the authority of the police juries, and it passed Act No. 107, p. 172, of 188S, which provides:
“Section 1. * * * That the police juries * * * are authorized and empowered to divide their respective parishes into as many districts as they may deem necessary or advantageous for the more readily draining the land in said parishes,” etc.
Section 2 provides for the appointment by police juries of- drainage commissioners; and section 4 provides:
“That the duties of said commissioners shall consist in opening and cleaning all the natural drains in their respective districts. * * *
They shall, likewise, have the power of cutting and opening new drains, when deemed necessary, provided that, when, in the estimation of the said commissioners; it is necessary to cut and open new drains, the matter shall be submitted to the landowners of said district who shall decide on the advisability of the same and on the manner and location in which said drains shall be cut.”
Provision is also made for the levying of a tax, with the consent of the landowners, “in order to raise the funds necessary to carry out the provisions of this act.” Act No. 37, p. 40, of 1894, is to the same effect, and contains further provisions relating to the manner of obtaining the approval of the landowners, and Act No. 125, p. 180, of 1896, further provides that:
“Whenever the commissioners shall have been authorized to cut and open a new drain, or new drains * * *, the police jury * * * shall have full power to expropriate any land, or lands, across, or through, which, it is proposed to cut and open said new drain, or drains, in accordance with the expropriation laws of the state.”
The matter of public' drainage was, however, still in an unsatisfactory condition, and the convention by which the present Constitution was adopted dealt with it (in article 281 of that instrument) to the extent of authorizing drainage districts to contract debts, issue bonds, and impose special taxes- for the payment of the same. In 1899 an act was passed purporting to carry article 281 of the Constitution into effect, but it was an incomplete piece of legislation, and the following year, at its regular session, the General Assembly passed Act No. 12, p. 12, of 1900, authorizing the establishment of drainage districts, composed of land in different parishes, making other provision with regard to the organization of the board of commissioners, and further providing:
“Sec. 6. * * * That the said drainage boards * * * shall have the power, and it shall be their duty, to open all natural drains which they may deem necessary in their respective districts, and to perform all work, therewith connected, which they may deem necessary to make the opening of said natural drains effective. They shall have the further power of cutting and opening new drains ahd canals, when deemed necessary. Power is es *515 pecially conferred upon any drainage district organized under the provisions. of this act, and the commissioners thereof, to secure rights of way, necessary for the cutting of canals, or other works, for the drainage of their districts, and, to do this, they shall have power to bring expropriation suits and expropriate all lands that may be necessary for the purpose of securing said rights of way.”
Section 17 imposes a penalty upon any persons who may dam, obstruct, or injure any drain canal created or improved under the provisions of this act, and there are other provisions which do not concern this case. Act No. 159, p. 293, of 1902, amends the act above quoted, but confers power on the drainage commissioners in the same terms. Act No. 61, p. 142, of 1904, provides:
“Section 1. * * * That the various levee and drainage districts of the state shall have control over all public drainage channels within the limits of their respective districts, and for a space of 100 feet on each side thereof selected by the district and recommended and approved by the board of state engineers, whether such drainage channels have been approved by the levee or drainage district or have been adopted without improvement, as necessary parts of, or extensions to, improved drainage channels, and shall have authority to adopt rules and regulations for preserving the efficiency of said drainage channels.”
Section 2 of the act provides that:
“Any one shall be guilty of a misdemeanor and shall be subject to fine, or imprisonment, or both who shall obstruct such drainage channels, by bridging same, except in accordance with plans, specifications and instructions prescribed by the District, construct locks, dams, or gates on channels; * * * or, in any manner, obstruct such drainage channels or violate any of the rules or regulations adopted and promulgated by the district for preserving and maintaining the efficiency of such drainage channels.”
Our conclusion from the law and jurisprudence to which we have thus referred is that it has always been recognized in both that the alluvial soil in this state can no better be cultivated or kept in habitable condition without “frequent open drains” (quoting the language of’ this court in one of the cases cited) than it can be traversed without roads. The prohibition against the obstruction of the natural drains is, and has always been, part of the law, and is to be read into every title by which land is held. When, therefore, defendant acquired its right of way, say 150 feet in -width,- crossing all the natural drains in the western part of the parish of Iberia, leading to Bay Vermilion on the south, it did so sub modo; the condition being that it should not obstruct those drains. The Southern Pacific Railroad (the parent road), it may be remarked, in like manner traverses almost the entire southern part of the state, thereby crossing practically all of the drains, save the Mississippi river, which lead from the upper part of the state to the Gulf of Mexico. The maintenance and control of these drains, we take it, is as clearly within the police power of the state as is the maintenance of the public roads, and the power which the state has conferred' upon the police juries in that regard has been recognized by this court as power of that character. Sarpy et al. v. Hymel, 40 La. Ann. 432, 4 South. 439.
The same view has been taken by the Supreme Court of the United States in a comparatively recent case, which, as to the main principles of law involved, we are unable to distinguish from the case at bar, and in which it is held that the police power of a state includes the power necessary, not only to the opening and maintenance, but to the widening and deepening of the natural drains; that the imposition upon a railroad company of the entire cost of removing and rebuilding a bridge constructed by it across such drain and of a culvert rendered necessary by the widening and deepening of the channel for drainage purposes is not a taking of private property for public use, which requires compensation in order to afford due process of law; that the equal protection of the law is not denied to such company in requiring it to remove and rebuild.its bridge and culvert for the purpose stated; that the expense of removing the soil attendant upon *517 the widening and deepening of such drain cannot, however, he imposed upon such company without denying it due process of law. In the course of the opinion the Supreme Court, through Mr. Justice Harlan, quotes the following from the opinion of the Supreme Court of Illinois, from which the case had been brought by writ of error, to wit:
“The right of drainage through a natural water course or a natural waterway is a natural easement appurtenant to the land of every individual through whose land such natural water course runs, and every owner of land along such water course is obliged to take notice of the natural easement possessed by other owners along the same water course. * * * Where lands are valuable for cultivation, and the country, as this, depends so much upon agriculture, the public welfare demands that the land shall be drained; and, in the absence of any constitutional provision in relation to such laws, they have been sustained upon high authority as the exercise of police power.”
Quoting from its own opinion in the case of New Orleans Gaslight Company v. Drainage Commission, 197 U. S. 453, 25 Sup. Ct. 471, 49 L. Ed. 831, and referring to the case of Chicago, B. & Q. R. Co. v. Chicago, 166 U. S. 226, 17 Sup. Ct. 581, 41 L. Ed. 979, the court said:
“In the latter ease it was held that uncompensated obedience to a regulation enacted for the public safety under the police power of the state was not taking property without compensation. In our view, that is all there is in this case. The gas company by its grant from the city acquired no exclusive right to the location of its pipes in the streets as chosen by it under a general grant of authority to use the streets. The city made no contract that the gas company should not be disturbed in the location chosen. In the exercise of the police power of the state, for a purpose highly necessary in the promotion of public health, it has become necessary to change the location of the pipes of the gas company so as to accommodate them to the new public work. In complying with the requirement at its own expense, none of the property of the gas company has been taken, and the injury sustained is damnum absque injuria.” Chicago, B. & Q. R. Co. v. Illinois ex rel. Grimwood, 200 U. S. 561, 26 Sup. Ct. 341, 50 L. Ed. 596.
It will thus be seen that in Illinois the right of drainage in a natural waterway has been found in the common law. In this state it has been found in the Revised Civil Code. In Illinois it is held that such right in the interest of agriculture and the public welfare may be enforced through the exercise of the police power of the state. It has been so held here. In the case cited it is held that a general grant of authority to a gaslight company to lay its pipes in the streets of a city does not carry with it a warranty that it may not be required to change the location of such pipes for the promotion of a purpose necessary to the public health. In the instant case the general authority contained in its charter, under which defendant constructed its road and bridged or trestled the natural drains of the state, conferred upon it no right to obstruct those drains or to render them inaccessible for purposes of maintenance. Nor did it guarantee the defendant against the deepening and widening of the drains by the state in the proper exercise of its police power.
It is true that it has been held as between individuals dealing with each other that the owner of the upper estate cannot require the enlargement of the drain upon the lower estate, but, under the jurisprudence at that time, the owner of the upper estate was not permitted to concentrate the drainage water upon his land and empty it upon his neighbor in a single ditch or canal. The later decisions hold that he can effect the drainage of his place in that way, and it would appear to follow that his neighbor must receive the drainage as thus delivered.
If, therefore, the owners of the 25,000, or 30,000 acres of land which plaintiff is endeavoring to drain were before the court, showing that, by means of ditches and canals leading into Coulee Hayes, they had fitted their land for cultivation, and demanding an outlet through that natural drain across plaintiff’s right of way for the water thus concentrated, we are inclined to think that they would be entitled to at least respectful *519 consideration. As the matter stands, the plaintiff actually before the court is a public corporation created, as many corporations identical in character have been created, for a purpose which is vital to the welfare and prosperity of the state, and which can be reasonably accomplished in no other way than by the exercise of the sovereign power of the state.
In the capacity stated, plaintiff represents whatever rights and interest the state may have in promoting and maintaining the efficiency of its natural drains, and in so doing represents the rights and' interests of the owners of the particular lands which it is seeking to drain and of the body of citizens of the state at large, and it is vested with such power as the state possesses for the vindication of those rights. The question, then, is do the rights, interests, and powers thus represented constitute a sufficient basis upon which to rest the judgment for which plaintiff prays? We are of opinion that they do. Defendant never acquired the right to obstruct Coulee I-Iayes, or, as against the state, to render it inaccessible for the purpose of maintenance, and it has both obstructed and rendered it inaccessible for such purpose by -the piling which it has driven in the bed of the stream for the support of its different trestles. Whether as between it and the individual owner of a tract above it could be required to permit the enlargement of the drain is a matter which need not be here decided. As between it and the state, represented by plaintiff, exercising the police power of the state, we are of opinion that it can be so required. It is true that the law (which has been quoted) contemplates the expropriation of property, and payment therefor, 'when new drains are cut, but we do not understand it to mean that the owner of land through which an old, natural, drain passes is to be compensated for such shovelfuls of earth as are removed in making such drain efficient.
We may say, in conclusion, that we find the authority granted to plaintiff to open and clean out natural drains sufficient justification for its entry for that purpose upon the property of defendant through which such a drain passes, and we are of opinion that, after reasonable demand for the removal of an obstruction to the drain here in question, and the failure of the defendant to remove it, plaintiff was authorized to cause its removal without appealing to the court. It is hardly necessary to add that the case here presented is a very different one from that which we supposed was presented on the application for the writ of prohibition. We, however, attribute no blame to the counsel in the matter, and are glad to have an opportunity of dealing with the whole case after a full hearing of both sides.
Judgment affirmed..'