Statement of the Case.
MONROE, C. J.
This suit was dismissed by the trial court upon an exception of no cause of action, and plaintiff has appealed.
The petition alleges: That plaintiff is owner and in possession of the E. % of section 17, less lot 3, and lot 2 of section 16, township 13, range 14 (in the parish of Red river), “to the center of the stream of Coushatta Bayou, a nonnavigable stream, situated wholly in the state of Louisiana.” That it acquired that property by a chain of title tracing back to the state, and that the state acquired it from the United States. That at the dates of the state’s acquisition and sale there was in force a provision of an act of Congress of 1803 (now incorporated in Rev. St. U. S. as section 2476 [U. S. Comp. St. 1916, § 4918]), reading:
“All navigable rivers, within the territory occupied by the public lands, shall remain and be deemed public highways; and, in all cases where the opposite banks of any stream not navigable, belong to different persons, the stream and the bed thereof shall become common to both.”
That defendant claims mineral rights in the bed of Coushatta Bayou under a lease from the state, and is thereby slandering plaintiff’s title. That its title quoad the bed , of the stream is an incident to, and, whether described or not, was intended to be included in, the ownership of the adjacent land. That by its acquisition of said land it acquired a vested right in the bed of the stream to its thread, and the attempt on the part of the state to deprive it of such right is an attempt to take its property without due process of law and without compensation, in violation of the Constitution of the United States. That in any event it is entitled to the water front of said stream, and to have the water free and unpolluted by any act of the state or its assigns, and that for defendant to drill in said bayou for oil and gas would be to deprive it of those vested rights, in violation of-the Constitution. It prays that defendant be ordered to cease slandering its title and enjoined from entering upon the property in question, and particularly for the purpose of drilling for oil or gas, and that its ownership and possession of the bed of said bayou in the sections mentioned to the thread of the stream be recognized.
The Standard Oil Company of Louisiana, alleging an interest as lessee from plaintiff, has intervened, and joins in plaintiff’s demands. It is conceded in the argument that the state acquired the tracts described in the petition from the United States under the swamp land grants of 1S49 and 1850; that in the original survey the bayou was meandered; that the patents under which plaintiff claims describe only the surveyed tracts, within the meander line; and that the question to be here decided is whether plaintiff’s title, as thus set out, includes the bed of the stream to its thread.
Opinion.
The provision of the act of Congress to which plaintiff refers has no authoritative bearing upon the issues to be decided. The Colonies possessed sovereign power, and in adopting the Constitution conferred upon Congress so much of that power as authorizes it to regulate commerce, which, it has been definitely determined, includes the power to regulate the highways of commerce, from which it follows that Congress may require the navigable streams of the country to be kept open to navigation, but, within that limitation, the power of the states to determine the rights of riparian proprietors whose lands border on such streams was reserved, as was also their power to determine the rights of riparian proprietors whose lands *877 border on nonnavigable waters. Beyond that, though the United States possessed those powers in the national territory, so long as it was not divided and organized into states, it is well settled that its grants of land in such territory left the state thereafter to be formed free to regulate riparian rights by their own laws; they having been admitted into the Union upon the same footing as the Colonies. In Shively v. Bowlby, 152 U. S. 1, 14 Sup. Ct. 548, 38 L. Ed. 331, it was held (quoting from the syllabus):
“The new states admitted into the Union since the adoption of the Constitution have the same rights * ® * in the tidewaters and in the lands under them” as the original states. “Grants by Congress of portions of public lands, within a territory to settlers thereon, though bordering on or bounded by navigable waters, convey, of their own force, no title or right below high-water mark, and do not impair the title and dominion of the future state when created.”
In St. Anthony Falls Water Power Co. v. Board, etc., 168 U. S. 349, 358, 374, 18 Sup. Ct. 157, 161, 42 L. Ed. 497, it was said:
“Property rights of riparian owners are to be measured by the rules and decisions of the state courts. * * * The act of Congress making the Mississippi river a common highway * * * does not impair the title and jurisdiction of a state over the navigable waters within her boundaries any more than such rights are limited with regard to the original states.”
And in Hardin v. Shedd, 190 U. S. 519, 23 Sup. Ct. 685, 47 L. Ed. 1158, it was said:
“When land is conveyed by the United States, bounded on a nonnavigable lake belonging to it, the grounds for the decision [as to the rights of riparian proprietors] must be quite different from the considerations affecting a conveyance of land bounded on navigable water. In the latter case the land under the water does not belong to the United States, but has passed to the state by its admission to the Union. Nevertheless it has become established almost without argument that in the former case, as in the latter, the effect of the grant on the title to adjoining submerged land will be determined by the law of the state where the land lies. In the case of land bounded by a nonnavigable lake the United States assumes the position of a private owner subject to the general law of the state, so far as its conveyances are concerned [citing a number of decisions]. Such cases are not affected by Rev. Stat. §§ 2476, 5251 (U. S. Comp. Stat. 1901, pp. 1567, 3522). When land under navigable water passes to the riparian proprietor, along with the grant of the shore by the United States, it does not pass by force of the grant alone, because the United States does not own it, but it passes by force of the declaration of the state * * * that it is attached to the shore. The rule as to conveyances bounded on nonnavigable lakes does not mean that the land under such water also passed to the state on its admission [to the Union], apart from the swamp land act, but is a convenient, possibly the most convenient, way of determining the effect of a grant.”
[1] Nevertheless, though the riparian rights of the owners of all land are to be determined according to the law of the state where the land lies, and though the act of Congress referred to by plaintiff does not authoritatively affect that question, yet, if a state, interpreting its own law, asserts title to a water bed as having been acquired under such law as an accessory or appurtenance to adjacent dry land acquired by it, and sells the same land, by the same description and under the same law, to one of its citizens, it would seem illogical to deny that the citizen thereby acquired the water bed as the state had acquired it. Different courts, however, reach different conclusions of law from the same facts; facts develop a significance under certain conditions which they do not possess under others; different laws and systems of law are enacted and established in different states; and cases which, superficially considered, appear to involve identical issues, may, by critical analysis, disclose differences of fact, or law, or both, and require different solutions. Though at common law, as at one time interpreted by most authorities, navigable waters were those only which were within the ebb and flow of the tide, it has been settled that in this country they include all waters that are actually navigable. Though the common-law rule, as generally understood, was and is that the title of the abutting landowner extends to the thread of the stream of the navigable fresh water upon which his land abnts, early exceptions were made with respect to land abutting on the *879 shores of the great lakes and upon many of the large rivers of the country.
“The general rule adopted by both state and federal courts is that meander lines are not run as boundaries of the tract surveyed, but for the purpose of defining the sinuosities of the stream or other body of water and as a means of ascertaining the quantity of land embraced in the survey. The stream or other body of water, and not the meander line as actually run on the ground, is the boundary, and the rules adopted in the various states as to the extent of the title of the owner of land bounded upon rivers and other bodies of water apply in the case of land bounded upon meandered waters. The meander line will, however, be the boundary where it runs with regard to a supposed body of water which does not, in fact, exist; where the land between such line and the water is platted as a separate survey, or where the surveyor omits to include large tracts lying between the meander line, as surveyed, or as pretended to have been run on the ground, and the stream or other body of water.” 5 Cyc. pp. 899, 900, citing many authorities; Horne v. Smith, 159 U. S. 40-46, 15 Sup. Ct. 988, 40 L. Ed. 68; Security Land Co. v. Burns, 193 U. S. 167-188, 24 Sup. Ct. 425, 48 L. Ed. 662.
As there can be no more persuasive authority than the Supreme Court of the United States upon the question of the effect of lines run in the making of surveys under the authority of a statute of the United States, and upon the possible exceptions to the general rule on that subject, so there can be no more binding authority than that august tribunal in the matter of construing the common law, the civil law, and the statute law of the states, respectively, with the Constitution, and of determining the necessity for, and effect of, the application of the one or the other in cases involving rights claimed in any given case under land titles emanating from the United States. It is the settled jurisprudence of the court that the rights of riparian owners are to be determined in accordance with the law, as interpreted by the court of last resort, of the state in which their land is situated.
In Shively v. Bowlby, supra, the defendant (plaintiff in error) claimed under a grant from the United States land bounded by the Columbia river, and, the Supreme Court of Oregon having decided that the grant passed no title to lands below high-water mark, the Supreme Court of the United States, to which the case was taken by writ of error, entered into an exhaustive review of the common law upon the subject and held that the grant, though made when Oregon was a territory, did not of its own force convey such title, or impair the title and dominion of the future state, and, after, also reviewing the law and jurisprudence of the colonial states, speaking through Mr. Justice Gray, it said:
“The foregoing summary of the laws of the original states shows that there is no universal and uniform law upon the subject, but that each state has dealt with the lands under * * * waters within its borders according to its own views of justice and policy, reserving its own control over such lands, or granting rights therein to individuals or corporations, whether owners of the adjoining upland or not, as it considered for the best interests of the public.”
In Hardin v. Jordan, 140 U. S. 371-406, 11 Sup. Ct. 808, 35 L. Ed. 428, the court held that the common law was the law of Illinois, and that:
“By the common law fresh water lakes, * * * except the great navigable lakes, belong to the owners of the soil adjacent, who own the soil usque ad filum aquae.”
In Hardin v. Shedd, supra, it was found that, after the decision in Hardin v. Jordan, the law of Illinois had been settled by decisions of the Supreme Court of that state to the effect that conveyances of the upland do not carry title to land below the water lines of such nonnavigable lakes, and it said:
“Following these decisions, we must hold that the title set up by the plaintiffs in error fails.”
In Fuller v. Shedd, 161 Ill. 462, 44 N. E. 286, 33 L. R. A. 146, 52 Am. St. Rep. 380 (one of the cases thus referred to), the Supreme Court of Illinois declined to hold that:
“The grant to the riparian owner conveys the bed of a nonnavigable [meander] lake, and makes its waters mere private waters.”
And it held that:
“So long as such meandered lakes exist, over their waters and beds, when covered with water, *881 the state exercises control and holds the same in trust for all the people who alike have the benefit thereof, in fishing, boating, and the like.”
Prior to the decision of the ease of McDade v. Bossier Levee Board, 109 La. 625, 33 South. 628, this court, so far as we are at present informed, had not had occasion to pass upon the purpose and effect of meander lines or upon the question of the rights of riparian owners with respect to the beds of nonnavigable waters, save in cases of claims based on accretions or relictions, for which our law specifically provides, such provisions being, however, confined in their application, in the one case, to accretions formed to the shores of rivers and streams, whether navigable or nonnavigable, and, in the other to, what are called “derelictions,” formed by the retirement of running water from one shore and its encroachment on the other;, there being an express declaration to the effect that the right to derelictions “does not exist with respect to derelictions of the sea.” C. C. arts. 509, 510. In the McDade Case, whilst the fact is mentioned that the shallow lake, concerning part of the bed of which the litigation arose, had been meandered for. the purposes of the survey under which the plaintiff set up title, no particular significance was attached to it; and the claim was dealt with as though the land described in the title, of which the bed of the lake was thought to be an accessory, had been bounded by the lake shore. The lake, it appears, contained something more than 1,000 acres and was shallow, at best, and sometimes went dry, and we infer from the opinion of the court, though it is not so expressly stated, that it was practically cleared of water by reason of the improvement in the levee and drainage systems inaugurated and maintained at the expense of the state. Plaintiff had been in possession of an adjacent tract for several years,' and, when the condition thus mentioned was brought about, took possession of a portion of the relicted bottom, and, as the state had in the meanwhile conveyed the bottom to the levee board, which had recorded its title, he thereafter (brought a suit, similar to this, against the board, for slander of title, setting up, among other things, that the state had never acquired title, for the reason that the bed of the lake had not been surveyed when it was said to have been selected and approved to the state, under the swamp land acts, and that, if the state claimed to have acquired it as accessory or appurtenant to the adjacent land which had been surveyed, it had passed pro tanto, with the sale by the state of a portion of the same land, to plaintiff. Upon the first point the court held that the entire township, including all the swamp and overflowed land therein, had been surveyed and platted (as appeared from the plat filed in evidence); that the township and section lines had been run, except that the section lines had been extended only to the margin of the lake; that the contour of the lake had been meandered and the meander points marked by posts; that the state had selected the entire sections, portions of which were at the time under water, and that the selections had been approved; that it had thus acquired the overflowed as well as the dry land by direct grant under the act of 1849, and had not acquired the one merely as appurtenant to the other; and that, the grant having been made with reference to the character of the land (or of the major part, which determined the destination of the whole), and not with reference to the acreage of the dry land, the fact that only the acreage of such dry land was ascertained and reported was immaterial.
[2] The answer to the second contention was, in effect, that, as the state had not acquired the bed of the lake as an appurtenant to the adjacent land, the manner of its acquisition afforded no basis for that contention, and that the sale to plaintiff was not of the same land, but only of the portion in *883 tended to be sold, and hence was not made by the same description.
The case has little or no bearing upon the questions here presented. That persons who buy a stated number of acres of land bordered upon a nonnavigable body of water covering 1,000 or 10,000 acres, and having no current, at an agreed price per acre, and get possession of all that they buy, are entitled to divide the water bed between them when in the interest of the public and at the public expense it has been drained and made fit for habitation and cultivation, is a proposition which finds no support either in reason or in the law of this state. And where, as is the case in Southern Louisiana, all the lands are traversed by bayous, large and small, creeks, coulSes, and sloughs, which in some instances are wholly within the bounds of single plantations and in others border or pass through many plantations, the proposition that in selling the lands the state retained title to the beds of such streams, and may introduce a new vendee, or a lessee, into a planter’s front yard, or stable lot, with authority to operate an oil derrick, is startling and disturbing, to say the least of it.
We perhaps have no law which provides in specific terms that the sale of land bordering upon a nonnavigable stream carries with it title to the bed of the stream to its thread, but a good deal may be said as to the custom and common understanding antedating the acquisition of the territory by the United States, and in any event there is an abundance of law to resolve into thin air the pretensions upon which defendant relies.
Rural estates have always been bought and sold here with reference to the streams that furnish their water supply, and to the law which declares that he whose estate borders on running water, or through whose estate water runs, may use it as it runs (C. O. art. 661), and that the accretions formed successively and imperceptibly to the soil situated on the edge of a river or stream, whether navigable or not, belong to the owner of the soil (C. C. art. 509), and those provisions have been read into the titles to all the lands bordering upon all the streams, and through which streams have run, in this territory, since and before the state was created, and have vested in the owners of such lands the rights to which they refer.
In Cambre v. Kohn et al., 8 Mart. (N. S.) 576, 577, it was said by Judge Matthews, as the organ of the court, nearly 100 years ago:
“It is true that riparian owners of land acquire alluvions by the right of accession, as established by law; but so soon as they are completely formed and attached to the original soil they are considered as making a part of the estate to which they are joined ; * * * ‘ the portion thus added is not considered as new land; it is a part of the old, which acquires the same qualities and which belongs to the same owner in the same manner as the increase by the growth of a tree makes part of the tree” (quoted with approval in State v. Richardson, 140 La. 329, 72 South. 988).
In St. Clair Co. v. Lovingston, 90 U. S. 46-69, 23 L. Ed. 64, the matter in dispute was the title to an alluvion. which had formed upon the Illinois side of the Mississippi river and was claimed by St. Clair county, Ill., under acts of Congress and of the Legislature of Illinois which purported to grant it to that county as lying outside of the surveys of certain tracts of land which, when surveyed, bordered on the river, and had been acquired by the defendant in. error, in whose favor the case was decided by the Supreme Court of the state, whence it was taken to the Supreme Court of the United States, where, among other things, it was said:
“The riparian right to future alluvion is a vested right. It is an inherent and essential attribute of the original property. The title to the increment rests in the law of nature. It is the same with that of the owner of a tree to its fruits, and of the owner of flocks and herds to their natural increase. * * * We may well hold that the adjudications of this court to which we have referred are decisive of the case before us. They are binding * * * as authority. We are of the opinion that the United States never had any title to the premises in con *885 troversy, and that nothing passed hy the several acts of Congress and of the Legislature of Illinois relied upon by the plaintiff in error.”
The law governing servitudes would, perhaps, furnish a further reason for holding the position of defendant to be untenable, but we are of opinion that the reasons already given are sufficient, in so far as the right oi entry upon and use of the property in dispute is concerned. As to the title, the lawmakers have, for some reason, which is left to inference, refrained from any specific declaration. It may be because of the difficulty of combining all of the elements of ownership of such property in one title. Bayous not only serve to supply estates with water, but they also serve as channels through which the estates are drained, and they may in particular eases be “floatable streams,” .which serve as highways for the transportation of logs and other property. As natural drains, or “floating streams,” many persons may be interested in them, so that no one person can say as to a particular stream that there is united in him all the elements of perfect ownership, though the state, in the exercise of its police powers, and in the public interest, may, perhaps, maintain a certain control, or take certain action, the extent and circumstances of which we shall not here attempt to define. Boykin v. Shaffer, 13 La. Ann. 129; Petit Anse, etc., v. Iberia, etc., 124 La. 502, 50 South. 512. In view of the conditions under which this ease has been brought up, we are of opinion that it is sufficient for the present to hold that plaintiff’s petition discloses a cause of action for the issuance of an injunction, as prayed for, and we withhold any further expression upon the subject of the title, and, reserving all rights with respect thereto, leave that matter open for further consideration by our learned brother of the district court when he shall have heard the litigants upon the merits.
It is therefore ordered that the judgment appealed from be set aside, the exception of no cause of action overruled, and the case remanded to be proceeded with according to law and to the views expressed in the foregoing opinion; the costs of this appeal to be paid by defendant, and other costs to await the final judgment.