J^WOODARD, Judge.
This is a boundary dispute. Messrs. Paul S. and Ben Belton Bailey are the owners of a tract of land in Rapides Parish Louisiana, comprising 193.54 acres. On the southern boundary of their property is a tract of land comprising 52.3 acres owned by Mr. Andrew J. Fowler, II. When the Baileys and Mr. Fowler, II were unable to agree upon their shared boundary, the Baileys filed suit to have a court fix it. Mr. Fowler, II answered and reconvened, claiming that a portion of the Baileys’ property belonged to him through acquisitive prescription. The trial court fixed the boundary between the parties, differently from what-each party maintained was correct. The Baileys appealed, as did Mr. Fowler, II. We reverse and fix the boundary.
*132 FACTS
On June 30, 1992, the Baileys purchased a tract containing 193.54 acres. When they were unable to reach an amicable agreement with Mr. Fowler, II, who owned a 52.3 acre tract on the southern boundary of their property, they filed a petition against |s»Mr. Fowler, II and his descendants, on November 12, 1992, to have the boundary fixed. On January 4, 1993, Mr. Fowler, II answered the suit and claimed that his tract actually contained 187.36 acres, a large part of which was owned by the Baileys. The matter was tried July 13-15,1993.
The Baileys’ tract was part of Lots A, B, and C of the woodlands of Chaseland Plantation, as shown on a plat prepared by H. J. Daigre, Parish Surveyor, dated February of 1936, which was introduced into evidence. The titles to the Baileys’ property and to Mr. Fowler, II’s property trace back to a common author, Ms. Annie Paul Mathews Chase Mathews, with the Baileys’ title being the more ancient.
On December 30, 1899, Ms. Annie Paul Mathews Chase Mathews purchased Chaseland Plantation from the Union Mortgage Bank & Trust Co., Limited. The property was comprised of 4,210 acres located on both sides of Bayou Bouef, some sixteen miles south of Alexandria, Louisiana. On July 31, 1902, Ms. Matthews sold a 52.3 acre tract of her Chase-land Plantation to T.R. Delaney. Attached to this act of sale was a plat of survey, dated 1902, by George O. Elms. It is this tract which was sold to Mr. Delaney that ultimately comes into Mr. Fowler, II’s possession.
The title of the Baileys’ 193.54 acre tract continues, uninterruptedly, from Ms. Annie Paul Mathews Chase Mathews to the Bailey’s immediate ancestor in title, Ms. Mary Jean Jackson D’Autremont. On April 20, 1909, the Chaseland Plantation was sold by the Sheriff of Rapides Parish from Ms. Annie Paul Mathews Chase Mathews to Mr. Eugene V. Weems. On April 22, 1909, Mr. Weems sold the plantation to Mr. Charles S. Mathews. This was followed by a sale, on February 25, 1918, by Mr. Mathews to: (1) Ms. Ann Mathews Hardy, (2) Mr. Thomas C. Mathews, (3) Ms. Ann G. Mathews, (4) Mr. William Chase Mathews, and (5) Ms. Medorra Mathews Jackson.
Ms. Medorra Mathews Jackson, one of the five persons who purchased a one-fifth interest in Chaseland Plantation, died March 19,1919. A judgment of possession was rendered, recognizing Mr. Joel M. Jackson, Mr. Robert S. Jackson, Ms. Elizabeth M. Jackson, and Ms. Annie Chase Jackson as sole heirs and placing them in possession of her one-fifth interest in Chaseland Plantation. Mr. Robert S. Jackson died and his father, Mr. Robert H. Jackson, and his three siblings, Mr. Joel M. Jackson, Ms. Elizabeth M. Jackson (Skelton), and Ms. Annie Chase Jackson were placed in possession of his interest in Chaseland Plantation. On November 14, 1935, Mr. Robert H. Jackson conveyed his interest in Chaseland Plantation to his remaining three |3children, Ms. Elizabeth Jackson Skelton, Ms. Annie Paul Chase Jackson, and Mr. Joel H. Jackson.
Ms. Ann G. Mathews and Mr. William Chase Mathews, two of the individuals who each purchased an undivided one-fifth interest in Chaseland Plantation from Mr. Charles S. Mathews, sold their two-fifths interest in Chaseland Plantation to Mr. Robert H. Jackson on August 23, 1923. On May 21, 1931, Mr. Robert H. Jackson sold the two-fifths interest he purchased from Ms. Ann G. Mathews and Mr. William Chase Mathews to Mr. Thomas M. Mathews, who had also purchased a one-fifth interest in Chaseland Plantation from Mr. Charles S. Mathews on April 25, 1918. On August 9, 1934, the Sheriff of Rapides Parish adjudicated the three-fifths interest that Mr. Thomas M. Mathews owned in Chaseland Plantation to Ms. Annie Guss Mathews.
On March 28, 1936, Ms. Ann Mathews, the widow of Edward Barrett, who ac *133 quired a one-fifth interest in the plantation from Mr. Charles S. Mathews; Ms. Annie Guss Mathews, who had acquired a three-fifths interest in the plantation; and Ms. Ann Chase Jackson, Ms. Elizabeth Jackson Skelton, and Mr. Joel M. Jackson, who owned the remaining one-fifth interest in the plantation entered into a partition of the plantation. The parish surveyor, Mr. H.J. Daigre, prepared a plat of survey of the plantation, dividing it into five lots, labeled A, B, C, D, and E. The Daigre survey shows the 52.3 acre tract, which had been sold to Mr. T.R. Delaney and ultimately came into the possession of Mr. Fowler, II, as being located between lots C and D. In the partition, Ms. Ann Mathews, widow of Mr. Edward Barrett, received Lot B; Ms. Annie Guss Mathews received Lots A, D, and E; and Ms. Ann Paul Chase Jackson, Mr. Joel M. Jackson, and Ms. Elizabeth J. Jackson received Lot C. On January 10, 1966, Ms. Ann Jackson Daniels donated her interest in Lot C to Mr. Gilbert W. Daniels, Jr.
On May 29, 1950, Ms. Annie Guss Mathews sold Lots A, D, and E of the plantation to Mr. Thales E. Cranford. Mr. Thales E. Cranford sold Lots A, D, and E of the plantation to Mr. Joel M. Jackson on August 3, 1950. On that same day, Mr. Joel M. Jackson sold an undivided one-half interest in Lots A, D, and E of the plantation to Ms. Elizabeth Jackson Skelton. Ms. Elizabeth Jackson Skelton sold all of her interest in Lots A, C, D, and E to Mr. James Allen Madison Skelton, Jr. on November 25,1958.
|4Ms. Ann Mathews Hardy Barrett died, and her three children, Ms. Agnes B. Hardy, Mr. Charles H. Hardy, and Ms. Hilda Hardy Hill, were recognized as sole heirs in a Judgment of possession signed May 17, 1938. On August 19, 1960, these children sold their interest in Lot B to Mr. Joel M. Jackson, husband of Ms. Connie Kendall Jackson. When they died, their two children, Ms. Mary Jean Jackson D’Autremont and Mr. Joel M. Jackson, Jr., were placed in possession of their interest in Lots A, B, C, D, and E of the plantation.
On July 30, 1987, the interest of Mr. Joel M. Jackson, Jr. in Lots A, B, C, D, and E of the plantation was adjudicated to the Bunkie Bank & Trust Company by a Trustee’s Deed in Mr. Jackson’s bankruptcy proceeding. The Bunkie Bank & Trust Company sold its right, title, and interest in Lots A, B, C, D, and E of the plantation to Mr. and Ms. Daniel Ball Derouen on February 14,1992.
Approximately four months later, the owners of Lots A, B, C, D, and E of the Chaseland Plantation entered into a partition of immovable property. Ms. Mary Jean Jackson D’Autremont received a tract containing 110 acres, more or less, in the west portion of Lots A and B and a tract containing seventy-nine acres, more or less, in Lot C and all of Lot C lying west of the center of the Central Louisiana Electric Company (CLECO) right of way crossing Lot C. It is this tract owned by Ms. D’Autremont and found to contain 193.54 acres, when surveyed by Mr. Fen-stermaker, which the Baileys purchased on June 30,1992.
On January 4, 1910, Mr. Delaney sold his 52.3 acre tract of the plantation, now Mr. Fowler, II’s, to Mr. Henry A. Wise. On January 7, 1916, Mr. Wise sold the tract to Mr. Allen G. Johnson who, in turn, sold it, on April 22, 1918, to Mr. Andrew J. Fowler (I), the defendant’s grandfather. This bill of sale describes the tract as being identical to the Mathews/Delaney sale and comprising 52.3 acres. Mr. Andrew Fowler (I) died in 1957. On March 20, 1974, through his succession, Mr. Jacob D. Fowler, the defendant’s father, received an undivided one-third interest in the tract; Ms. Mittie Fowler Harper received an undivided one-third interest; and the sons of the predeceased, Mr. Robert D. Fowler, Mr. Robert D. Fowler, Jr., and Mr. Jerry W. Fowler, each received an undivided one-sixth interest in the tract. By an act of sale dated August 30, 1967, Ms. Mittie Fowler Harper, Mr. Robert *134 Dewey Fowler, and Mr. Jerry W. Fowler had sold all their interest in the tract to Mr. Fowler, II. In 1982, upon | fiMr. Jacob D. Fowler’s death, his son, the defendant, Mr. Fowler, II, came into possession of the 52.3 acre tract.
In this suit, Mr. Fowler, II claims ownership of approximately 187 acres, while the Baileys maintain that he owns only 52.3 acres, as stated on the survey. In this century, in derogation of Mr. Fowler, II’s claim to ownership of the expanded boundary, the various owners of Chaseland Plantation have exercised acts of possession reflected by documents recorded in the Rapides Parish Courthouse. The record reflects that on February 21,1935, Mr. Wade H. Jones swore that, to his knowledge, Mr. E.S. Duck had cut pine timber from the Chaseland Plantation and that the plantation had belonged to the Mathews family for many years. On February 20, 1935, Mr. Thomas M. Mathews affirmed that Chaseland Plantation had been owned by his family since about the year 1804, and they had exercised physical possession of the tract by cutting pine timber and grazing cattle. On February 20, 1935, Mr. E.S. Duck affirmed that he had cut the pine timber on the woodlands of Chaseland Plantation belonging to the Mathews family on two occasions, once in about 1916 and, again, during the year 1934. In 1966, Mr. James M. Skelton, Mr. Joel M. Jackson, Jr., and Ms. Mary Jean Jackson D’Autremont executed a 100-foob-right-of-way-crossing Lots A, B, C, D, and E of the plantation in favor of CLE-CO. This right of way crosses property that Mr. Fowler, II claims in this suit that is owned by him, but we note that the record contains no evidence that either, he or his father made any legal claims to this tract in 1966 or against CLECO. On August 14, 1974, Mr. Joel Jackson, Jr., Ms. Jeanne Jackson D’Autremont, Mr. James A. Skelton, and Mr. Gilbert W. Daniels, Jr., sold to Roy 0. Martin Industries, Inc., all pine timber sixteen inches in diameter, measured twelve inches from the ground, and all hardwood timber twelve inches in diameter, measured twelve inches from the ground, growing on Lots A, B, C, D, and E of the plantation. On May 20, 1991, the owners of Lots A, B, C, D, and E of the plantation sold all the merchantable timber, except túpelo gum and cypress, to the Louisiana-Pacific Corporation (L.P.) pursuant to a Stumpage Sales Agreement. L.P. exercised its rights under the agreement and clear cut all of the timber on Lots A, B, C, D, and E of the plantation, except an area near the CLECO right of way. The property, which Mr. Fowler, II claims in this suit, had its timber cut off of it by Roy O. Martin and L.P., however, neither Mr. Fowler, II, nor his father made any legal claims against the two timber companies at the time of their timber harvests. The two timber companies did |finot cut the timber on the 52.3 acre tract that has historically been considered the “Old Fowler Place.”
Mr. Fowler, IPs critical contention concerning his claim of a portion of the Baileys’ property was that for more than thirty years a fence had enclosed the claimed property, as indicated on the survey which his counsel mysteriously discovered in the records of the Rapides Parish Courthouse the day before trial. Specifically, the central issue of the case was whether the fence was located in the Cockrell Creek bottom, which ran through the Fowler tract, as the Baileys claim, or whether it was located in the hills above Cockrell Creek, as Mr. Fowler, II claims.
Mr. Paul S. Bailey testified that at the time of trial he was fifty-six years of age and had lived in the area all his life, except for two years in the service, and was very familiar with the Old Fowler Place. From about 1943 or 1944, he recalls having gone on both tracts, hunting and rounding up cattle and hogs that belonged to his family. He testified that there was only one fence on the north side of Cockrell Creek that was within the Cockrell Creek Bottom, that there had never been a fence in the area where L.P. clear cut the timber, and *135 that there was never a fence located where Mr. Fowler, II contended.
Mr. Robert A. Fenstermaker, a registered land surveyor, surveyed the tract for the Baileys’ purchase of it from Ms. Mary Jean D’Autremont. His survey was introduced into evidence. He found that the tract the Baileys purchased included 193.54 acres and was of the opinion that the 52.3 acre tract, shown on the H.J. Daigre plat of 1936 for the partition of the Chaseland Plantation, was the Fowler tract and that it appeared on his survey. He testified that he confirmed this by returning to the property in May of 1993 and locating the remnants of the fence that surrounded the 52.3 acre tract and that he was unable to find any remnants of a fence along the line where Mr. Fowler, II contended his fence ran.
Mr. Clinton E. Bailey, who was eighty-three years old, testified that he was very familiar with the fence that had surrounded the Fowler tract. He, along with his father, farmed the Fowler tract for several years. He noted that it was his job to walk the fence every year to make sure it was secure; that the fence would keep hogs, cattle, goats, and sheep out of the two fields where his father planted corn; and that he had returned to the area prior to trial and found some evidence of the old fence. The remnants of the old fence were exactly in the place where he remembered it had been when he had repaired |7it in the past. He stated that the fence did not go into the hills; it stayed right inside the bottom at the edge of the hills and it did not go to the area of the CLECO right of way.
Mr. Kenneth James Perry, who was seventy-three years old at the time of trial, testified that he had lived the majority of his life in the area of the property in dispute and that he was familiar with the Old Fowler Place and the fence that surrounded it. He said that the fence around the Fowler tract did not go into the hills, but stayed in the Cockrell Creek bottom area. Prior to trial, also, he had returned to the area and observed the L.P. clear cut around the Fowler tract. He confirmed that there was never a fence in the area where the timber had been cut by L.P., nor was there a fence that went to the CLECO right of way line.
Mr. D.B. Sanders, Jr. testified that he was employed by Roy 0. Martin Industries, Inc. (Martin) when Martin cut the timber on Lots A, B, C, D, and E of the Chaseland Plantation in 1974. He remarked that before Martin cut the timber, Mr. Fowler, II contacted him and told him that he owned an area near the plantation. Subsequent to that call, Mr. Sanders obtained a copy of George 0. Elms’ survey to locate the boundary to the tract Mr. Fowler, II was claiming. In the process of locating the boundary, Mr. Sanders met Mr. Fowler, II on the property and showed him where he had marked the line around the Fowler tract which was consistent with the Elms’ survey. Subsequently, Martin cut the timber outside the 52.3 acre tract without complaint from Mr. Fowler, II.
Mr. Lloyd W. Whatley also testified that he was an employee of Martin and had worked with Mr. Sanders in locating the line around the Fowler place. He affirmed that he had found evidence of a fence, which was in bad shape, but visible enough to allow him to find the property line using the Elms’ survey, and that the fence did not go into the hills by the CLECO right of way. Prior to trial, he, too, had returned to the Fowler tract and found evidence of the same fence which he had located in 1974. It was in the same place as in 1974.
Mr. Barney Bailey, the brother of Mr. Paul S. Bailey, lived in the area until the 1950’s, when he moved to New Mexico. He testified that he was familiar with the Chaseland Plantation and the Fowler place; that he recalled a fence around the Fowler place that just went around the two fields in the Cockrell Creek bottom; that he specifically recalled being on the *136 Fowler place on December 7, 1941, hunting squirrels; |sand he testified that, although the fence was more visible at that time, it is still in the same place.
Mr. Jessie Chaffin, who was the forest procurement manager for L.P., asserted that before the timber was cut, he had located the 52.3 acre tract shown on the Elms’ survey. On the ground, he found evidence of an old wire net fence with some barbed wire. He stated that he marked the buffer between the area of the fence and the area to be clear cut. He did not find any evidence that the fence went into the CLECO right of way line.
Mr. Michael C. Boone, the secretary-treasurer of the Meeker Hunting Club, which had been hunting on the Chaseland Plantation since 1979, testified that he had been hunting every season on the plantation, even before the hunting club was formed in 1979. He said that he was familiar with the Fowler tract; that the fence, which bordered the Fowler tract, was located in the Cockrell Creek bottom and not in the hills; and that it did not cross the CLECO right of way line.
Mr. Fowler, II’s surveyor, Mr. James W. Townsend, testified that he found no evidence of a fence along the line he surveyed for Mr. Fowler, II based on the survey, dated May 7, 1918, which Mr. Fowler, II’s counsel mysteriously discovered the day before trial. He remarked that, based upon the survey attached to an oil and gas lease found in the courthouse records and dated May 7, 1918, his survey found the survey monuments marking the thirteen corners to the property. He described these markers as axles or square bars, which he testified were of the type used in the early part of the century compared to those commonly used today. He described the hilly nature of the topography of the terrain that he surveyed, pursuant to the May 7, 1918 survey, and maintained that the tract was, indeed, 187.36 acres.
Mr. Larry Malone, a logging contractor for L.P., testified. However, when his sworn testimony proved to be inconsistent with a prior statement he had made to Mr. Fowler, II, which Mr. Fowler, II had secretly recorded, Mr. Fowler, II’s counsel was allowed to play the prior inconsistent statement during the court’s proceedings. Mr. Malone’s prior inconsistent statement impeached his sworn testimony. Consequently, we attribute no weight at all to any of his testimony or unsworn statement. This issue is discussed in more detail below in that portion of the opinion styled, the Recorded Statement.
|sMr. Herbert Murrell affirmed that he had cut timber on the Fowler property in 1973, having purchased the timber from Mr. Fowler, II’s father. He testified that Mr. Jacob D. Fowler walked an old fence around the property that crossed the CLECO power line and went on the north side of the power line. He described the fence as a wire mesh with two or three barbs with old time lightered-pine posts.
Mr. Fowler, II testified that the boundary fence was a net wire fence with a couple of barbed wires on the top with old, rich lightered hard pine posts and that the fence went all the way around the property. According to him, every corner of the fence was marked with iron stakes or markers. He averred that he remembered seeing this when he was ten years old and that his grandfather had controlled all of this property. He said that the fence in the Cockrell Creek bottom which Mr. Fenstermaker found and about which others testified was not the perimeter fence on the property; it was an interior fence that was used to water livestock and went down to a ford in the creek. Mr. Fowler, II admitted on cross-examination that his reputation for truthfulness had been attacked by other counsel who presented witnesses to his lack of truthfulness in other cases in which he had been involved.
Mr. Johnny L. Strange, a fifty-six year old man, testified that he was familiar with the property known as the Old Fowler *137 Place. He remembered going onto the property in 1944 or 1945 and that he had hunted on it, but stated that he had not been there in eight or nine years. He said that he remembered a fence in the creek bottom, but that it ran out to the hills and that the fence crossed the CLECO right of way line. He testified that he saw an old buggy axle sticking up as a marker on the fence line. On cross examination, he testified that he only remembered one fence, not two, being on the property.
The record contains evidence of photographs of Mr. Fowler, II standing by his monuments that he contends mark his property claim, aerial photographs and topographical maps of the area, the parties’ surveys of the tract in dispute, the 1902 George 0. Elms’ survey of the Fowler tract, the H.J. Daigre survey dated February of 1936, and documents from the Rap-ides Parish Courthouse, reflecting the record title of the parties’ tracts and oil and gas leases relating to the Fowler tract. The record also contains offers of proof by the parties in the form of testimony and documents which the trial court refused to admit into evidence. We find no prejudice to either party by |inthe trial courts’ rulings on the offers of proof and we have not considered any of the proffered evidence in this decision.
Procedurally, on May 24, 1993, the Baileys filed a motion in limine to exclude from evidence part of a plat whose preparer is unknown. It was heard on June 14, 1993, and the trial court excluded the document. This decision is one of Mr. Fowler, II’s issues in this appeal. See below that portion of the opinion entitled, the Copy op the Survey.
This case was tried July 13-15, 1993. The Baileys requested that the trial court exclude from evidence another document— a plat dated May 18, 1918, which purported to be a copy of the same document previously excluded and which Mr. Fowler, II’s counsel had mysteriously discovered in the records of the Rapides Parish Courthouse the day before trial. The trial court ruled this one admissible and fixed the boundary between the tracts as follows:
Begin at the Northwest corner of Lot A of the Chaseland Plantation Partition being the corner common to Sections 22, 23 and 2, TIN, R1W, Rapides Parish, thence proceed South 28 degrees 29 minutes East a distance of 3,777.18 feet to a point and corner; thence proceed North 61 degrees 31 minutes East a distance of 1,145.7 feet to a point and corner, being the point of beginning of the boundary line between the Bailey and the Fowler properties and designated as Point A; thence proceed from Point A North 67 degrees 15 minutes West a distance of 970.8 feet to a point being Point B; thence proceed from Point B North 13 degrees 00 minutes East a distance of 248.6 feet to a point being Point C; thence proceed from Point C North 61 degrees 58 minutes East a distance of 1,465.4 feet to a point being Point D; thence proceed from Point D North 72 degrees 43 minutes East a distance of 638.3 feet to a point being Point E; from Point E proceed North 88 degrees 32 minutes East a distance of 959.1 feet to Point F being in the center of the CLECO powerline easement; the line described above from A to B to C to D to E to F being the boundary line between the Bailey and Fowler properties and is shown on a Survey Map filed and recorded in Plat File Drawer I, Bin V at page 85, records of Rapides Parish, a certified copy of which is filed in the above captioned and numbered proceeding marked as Exhibit “Boundary Line Plat”[.]
A judgment fixing this boundary was signed on September 27, 1993.
On October 6, 1993, the Baileys filed a motion for a new trial. They contended that the mysterious plat dated May 7, 1918, which Mr. Fowler, II’s counsel found attached to the oil and gas lease in the Rapides Parish Courthouse the day before trial, was of doubtful credibility because of an apparent discrepancy in the signature *138 of the Incivil engineer or surveyor, who allegedly had signed the survey. The New Trial Motion was heard on November 29, 1993. On June 22, 1998, Mr. Fowler, II filed a motion for an order to show cause why an expert witness should not be appointed. This motion was heard on July 27, 1998 at which time, the trial court ordered a new trial limited to the admissibility of the May 7, 1918 plat. The matter was heard on September 2, 1998. The trial court retroactively held the 1918 plat to be inadmissible, but did not change his earlier judgment of the boundary line between the two tracts of land. A judgment granting the new trial was signed on September 10, 1998, and on September 21, 1998, the trial court signed the judgment fixing the boundary as described above. Mr. Fowler, II appealed the trial court’s decision concerning the May 7, 1918 survey, discussed in more detail below in that portion of the opinion, entitled, the 1918 Sylvester Plat.
The Baileys filed a motion for a devolu-tive appeal. On October 21, 1998, Mr. Fowler, II, likewise, was granted a devolu-tive appeal. On March 24, 1999, the record and transcript were filed with this court.
ASSIGNMENTS OF ERROR
The Baileys claim, as an assignment of error, that the trial court failed to follow the requirements of La.Civ.Code art. 792 in fixing the boundary line between their and Mr. Fowler, II’s property.
The Fowler, IIs urge that the trial court committed manifest error:
1.And abused its discretion when on June 14, 1993, in chambers and before the hearing on Plaintiffs Motion in Limine, the trial court held inadmissible at trial the copy of the survey used by the defendant’s surveyor to locate and survey the boundaries of the Fowler, II property. This occurred before the hearing and before defendant could offer evidence in support of the admissibility of that copy of survey, thus, only allowing the defendant to make an offer of proof of that evidence. All of which constituted the error complained of.
2. And abused its discretion when after trial admitting the document at the trial on the merits, and after the granting of Plaintiffs Motion for New Trial, then at the September 2, 1998 hearing on the Partial New Trial concerning the admissibility of that document, the trial court retroactively held that certified copy of the 1918 W.H. Sylvester plat of survey inadmissible and further refused to admit into evidence the testimony and exhibits defendant there offered in support of the admissibility of the certified copy of the survey (Trial Exhibit Fowler, II No. 5), thus requiring the defendant to \nonly offer that evidence under offers of proof. All of which constituted the error complained of herein.
3. And abused its discretion when it used the recorded statement of the Louisiana Pacific loggers, Larry Malone and Norman Malone as impeachment evidence only, refusing to allow and use the testimony as substantive evidence on the merits.
4. When it failed to place the fence and boundary between defendant Fowler, II and plaintiff, Bailey on the boundary as defined by the monuments and markers located and determined by the surveyor Townsend in Exhibit Fowler, II No. 9.
LAW
The Boundary Line
In announcing oral reasons for judgment fixing the boundary line between the Baileys and the Fowler, II’s, the trial court stated, in part:
Under Civil Code Article 849, the Court must give deference to, first of all: number one, any natural monuments. *139 Natural monuments would be things-such as trees, rivers, creeks, cliffs and things of that nature.
Secondly, the Court must give recognition to any artificial monuments. Fences, houses, roads.
The third thing in setting boundary lines the Court must look at distances, meaning from point A to Point B, and/or courses, which means degrees, meters, chains.
Lastly, the Court must take into consideration quantities. The quantities are stated in surveys and/or plats.
Initially, we note that La.Civ.Code art. 849, upon which the trial court based its ruling, was repealed by Act 170 of the 1977 Louisiana legislative session, effective January 1, 1978. Thus, because of an error of law tainting the trial court’s judgment, the judgment must be set aside and the record reviewed de novo. In Richardson v. State, 98-918 (La.App. 3 Cir.12/9/98); 726 So.2d 417, writ denied, 99-483 (La. 4/1/99); 742 So.2d 561, we held that:
lia[W]hen a trial court committed reversible legal error and the entire record is before the appellate court, the appellate court is required to review the case de novo and render a judgement on the merits.
This we have done.
The following provisions of the Louisiana Civil Code and jurisprudence are applicable to this case:
Art. 792. Fixing of boundary according to ownership or possession.
The Court shall fix the boundary according to the ownership of the parties; if neither party proves ownership, the boundary shall be fixed according to limits established by possession.
Art. 793. Determination of ownership according to titles.
When both parties rely on titles only, the boundary shall be fixed according to titles. When the parties trace their titles to a common author, preference shall be given to the more ancient title. Art. 794. Determination of ownership according to prescription.
When a party proves acquisitive prescription, the boundary shall be fixed according to limits established by prescription rather than titles. If a party and his ancestors in title possessed for thirty years without interruption, within visible bounds, more land than their title called for, the boundary shall be fixed along these bounds.
In Leblanc v. Laborde, 368 So.2d 1126, 1127-28 (La.App. 3 Cir.), writ denied, 369 So.2d 1377 (La.1979), we profiled the burden of proof in boundary actions involving-acquisitive prescription:
[Wjhere there is a visible boundary and when there has been actual uninterrupted possession, either in person or through ancestors in title, for thirty years or more of the land extending beyond that described in the title and embraced within the visible bounds, then the party who possesses acquires the, right to the land beyond their title. William T. Burton Industries, Inc. v. Wellman, 343 So.2d 996 (La.1977); Brookshire v. Guidry, 355 So.2d 559 (La.App. 3 Cir.1978).
The requirements of these articles indicate that one must maintain an enclosure, such as a fence, around the property and exercise open, physical possession as owner for a continuous and uninterrupted period of thirty years. Martin Timber Company v. Taylor, 187 So.2d 196 (La.App. 3 Cir.1966). There must have been not only evidence of a corporeal | upossession of the property for the required period of time, but also a positive intent to possess as the owner shown by the possessor during that time. William T. Burton Industries v. McDonald, 346 So.2d 1333 (La.App. 3 Cir.1977). Finally, the tacking of possession of all predecessors in title is permitted for acquisitive prescription beyond title to a visible boundary. Du *140 bois v. Richard, 223 So.2d 198 (La.App. 3 Cir.1969).
In the instant case, the Baileys did not bear the burden of proving the boundary between their property and Mr. Fowler, II’s, as they relied on their title. On the other hand, Mr. Fowler, II, who claimed that he possessed a 187.36 acre tract, bore the burden of proving by a preponderance of the evidence that he and his ancestors in title possessed for more than thirty years, without interruption, within visible boundaries more land than was called for in his title, which reflected that he owned only 52.3 acres.
We have reviewed the entire record and conclude that Mr. Fowler, II did not satisfy his burden of proof that he and his ancestors possessed, uninterruptedly, a 187.36 acre tract within the visible boundaries of a fence for more than thirty years. The trial court found that “[l]astly, it is the opinion of this Court that since no positive evidence fencing, (sic) of where that fence was located, the Court is of the opinion that it has to in fact, assume the duty to set the boundary line.” Given Mr. Fowler, II’s credibility problems and his survey document, his impeachment of his own witness, Mr. Malone, and the consistency of the Baileys’ witnesses testimony about the location of the fence, the surveys of 1902, 1936, and Fenstermaker’s survey of 1993, the possession which the Baileys’ ancestors exercised over the tract, by timber cutting in 1974, and 1991, and the sale of the right of way to CLECO in 1966, all without legal protest from Mr. Fowler, II or his family, we conclude that the trial court’s determination that there is “no positive evidence fencing (sic), of where that fence was located” is correct.
Once the trial court made the determination that Mr. Fowler, II had failed to carry his burden of proof, that he and his ancestors in title had possessed the property in question, within visible boundaries of a fence for more than thirty years without interruption, then La.Civ.Code art. 792 required the court to fix the boundary according to the Baileys’ title. In a boundary action, a party who proves ownership, by an unbroken chain of transfers from a previous owner or from a more ancient title from a common author, as the Baileys did, should prevail unless the adverse party proves ownership by acquisitive prescription, which Mr. Fowler, II did not do. King’s Farm, Inc. v. Concordia Parish Police Jury, 97-1056 (La.App. 3 Cir. 3/6/98); 709 So.2d 953, writ denied, 98-1450 (La.9/18/98); 724 So.2d 748.
Considering the record as a whole, we find that the best evidence of the boundary between the two tracts, as reflected in the parties’ titles, is the line which Mr. Robert A. Fenstermaker’s survey established. This 1993 document was introduced into evidence. On the other hand, Mr. Fowler, II introduced no evidence, attacking the Baileys’ title. The 1993 survey is historically consistent with the Elms’ survey of 1902, the Daigre survey of 1936, and the still existing remnants of the fence line around the Fowler tract.
The Copy of the Survey
When this dispute arose, Mr. Fowler, II, allegedly, had in his possession a blue print of an old plat that, purportedly, he had received from his father, Mr. Jacob D. Fowler, and his grandfather, Mr. Andrew J. Fowler (I). It was further submitted that Mr. Fowler, II left the original blue print in his truck while out on the property, and it disappeared. Mr. Fowler, II furnished a copy of this blue print to his surveyor, Mr. Townsend, for him to use in surveying Mr. Fowler, IBs claimed tract of the Baileys’ property. In Mr. Fowler, IBs deposition, the copy of this blue print was produced. Subsequently, the Baileys filed a motion in limine to exclude this survey. One month before trial on June 14, 1993, the trial court ruled it to be inadmissible, and at the hearing on the motion in li-mine, refused to admit Mr. Fowler, II’s evidence in support of that copy other than as an offer of proof.
*141 We have reviewed the document and the record concerning this issue. The document was an alleged plat, dated May 7, 1918, that was not filed in the public records, was not signed, contains no point of beginning, contained no certification that it actually represented an on-the-ground survey of the claimed Fowler, II property, and was not certified that the work had been performed by a registered or licensed engineer. The document could not be authenticated, under the provisions of La.Code Evid. art. 901, over the Baileys’ objection. Accordingly, the trial court did not abuse its vast discretion in ruling this document to be inadmissible, as it constituted inadmissible hearsay. La.Code Evid. art. 802. This assignment of error is without merit.
| trThe 1918 Sylvester Plat
Once the trial court ruled that Mr. Fowler, II’s alleged plat was inadmissible in response to the Baileys’ motion in li-mine, it is obvious that Mr. Fowler, II had. a critical problem in being able to prove his entitlement to the property he claimed beyond 52.3 acres. Mr. Fowler, II’s case was designed and engineered around the information contained on that alleged unsigned survey discussed above. It provided the foundation for his claims and proof at trial. For example, Mr. Fowler, II points to markers on the ground found on-the plat that allegedly had been there since early in this century; he alleges that the plat’s boundaries corresponded to a fence which encircled the property, comprising approximately 187.36 acres, which he sought to prove had been in his family’s possession for more than thirty years, i.e. 1920-1950. Additionally, the information on the plat described the boundaries to the property he claimed that his ancestors owned since his grandfather’s purchase of the tract. Later, his surveyor would use this same information to survey his claimed tract, and Mr. Fowler, II would introduce this survey into evidence to support his claims. With his legal training at L.S.U. law school and prior involvement in more than twenty other legal matters, some concerning property litigation, he and his counsel, no doubt, were well aware of their evidentiary difficulties with this case as a result of the trial court’s exclusion of the plat. Further suspicion is cast in Mr. Fowler, II’s direction because of his own admission that, in other cases in which he was involved, parties have attacked his reputation for truthfulness in the community, as the Baileys did on cross-examination and attempted to do in an offer of proof in the case sub judice.
One day before trial, Mr. Fowler, II’s counsel miraculously “discovered” a March 3, 1920 oil and gas lease, which Mr. Fowler, II’s grandfather had executed, to which was attached an alleged blue print copy of the same survey which the trial court had previously held was inadmissible and which was crucial to Mr. Fowler, II’s ability to prove his case. The records of the Rapides Parish Clerk of Court bore a designation of March 8, 1920, original number 65708. This survey was dated May 7,1918 and contained the alleged signature of “W. H. Sylvester, C.E.,” unlike the first survey which Mr. Fowler, II had attempted to enter into evidence. Additionally, this latest plat had the designation, “52.30 AC.” Mr. Fowler, II’s surveyor, Mr. Townsend, used this 1918 document to survey the tract and found an error; the shape of the boundaries were nearly correct but the actual acreage reflected on the document should have been 1 ^approximately 187.36 acres, not 52.3 acres, as Mr. Fowler, II claimed. It goes without saying that 135.06 acres is a huge discrepancy between the surveys and not one that would even remotely lend itself to a typographical error. Mr. Townsend testified that he was shocked at the difference in acreage between the two surveys of the same tract.
Mr. Fowler, II’s counsel offered this oil and gas lease, with the alleged plat, into evidence. The Baileys’ counsel objected that the document had not been listed on the pre-trial order and should not be ad *142 mitted. Mr. Fowler, II’s counsel called the Deputy Clerk of Court to testify in support of admission of the document. The trial court admitted the oil and gas lease with the critical alleged plat attached to it.
After the trial, the trial court fixed the boundary between the Baileys’ property and the Fowler property, the judgment was signed on September 27, 1998, giving Mr. Fowler, II a portion of the property, which he had claimed beyond the 52.3 acres, although, not the entire 187.36.
On October 6, 1993, the Baileys filed a motion for new trial. In the motion, they alleged that, according to Mr. Robert G. Foley, a Forensic Document Examiner, the writer of the hand printed declarations and the signature of “W.H. Sylvester, C.E.” on the May 7, 1918 plat attached to the oil and gas lease, discovered the day before trial, was not the same person as “W. H. Sylvester, C.E.,” who had signed other plats about that same time, which were on file in the records of the Rapides Parish Courthouse. The Baileys alleged that there was no evidence that the plat in question was attached to the oil and gas lease on the date it was filed and that any presumption that the plat was part of the public records was contradicted by Mr. Foley’s conclusions. They asked the trial court to exclude the plat in question from evidence and to refix the boundary according to Mr. Robert A. Fenstermaker’s survey.
At that motion hearing, the Baileys called Mr. Foley, who had remarkable qualifications. He testified that he had reviewed six separate plats recorded in the Rapides Parish Courthouse and bearing the signature, “W. H. Sylvester, C.E.” Each one contained the date the plat was prepared, filed, and recorded in the parish records, unlike the plat in question, which did not have a date it was filed and recorded. He opined that the “W. H. Sylvester, C.E.,” who had signed the six plats he compared, was not the same person who had signed the May 7, 1918 plat in question in the instant case.
The trial court granted a new trial and signed a judgment to that effect on September 10,1998.
|1sOn June 22, 1998, Mr. Fowler, II filed a motion for an order to show cause why an expert witness should not be appointed. It was heard on July 27, 1998. At that time the trial judge ordered a new trial limited to the issue of the May 7, 1918 plat’s admissibility in evidence. The trial was scheduled for September 2, 1998. Following the presentation of witnesses, the trial court excluded the questioned plat from evidence, but did not change his original decision concerning the boundary line between the Baileys and Mr. Fowler, II.
Mr. Fowler, II contends that the trial court erred in its holding that the 1918 plat was inadmissible, as the document is critical to his claim of a large portion of the Baileys’ property. The Baileys responded that the court’s subsequent decision to hold the plat inadmissible did not prejudice Mr. Fowler, II, as it did not change the boundary line after so ruling.
On the other hand, Mr. Fowler, II urges that La.R.S. 13:3727 provides that acts, recorded in the conveyance records of the Office of the Clerk and Parish Recorder for nineteen years, shall be deemed prima facie proof of the contents of the original instrument upon admission; that, pursuant to La.R.S. 13:3729 regarding documents recorded for thirty years, the re-cordation is sufficient to establish a prima facie presumption of the execution and genuineness of the document; that, pursuant to La.Code Evid. art. 803(16), ancient documents may be admitted as an exception to the hearsay rule. Furthermore, at the new trial, Mr. Fowler, II argues that his witnesses provided sufficient authentication, as required by La.Code Evid. art. 901. He relied on the Louisiana Supreme Court case of Osborn v. Johnston, 322 So.2d 112, 116 (La. 1975) for the proposition that “the combination of age and re- *143 cordation not only authenticates the old document ... but ... establishes a ‘prima facie presumption of the execution and of the genuineness of the instrument.’ ” We note, however, a statutory presumption of genuineness of ancient documents is not conclusive, but, rather, rebuttable. Id.
The question before us is whether the Baileys presented sufficient proof that the document should not be entitled to the presumption of genuineness, thereby rendering the trial court’s decision of inadmissibility appropriate. Even without the Baileys’ proof, the document contains an inherent contradiction that seriously questions its genuineness. On the plat is written “52.3 acres,” which should mean that the number of acres contained within the designated boundaries are 52.3. Yet, upon physically |, ¡¿racing the outlines of the purported survey on the plat, much to his surprise, Mr. Fowler, II’s surveyor, Mr. Townsend, discovered, that the plat should have read approximately 187.36 acres to accurately reflect the acres contained within said alleged boundaries. Essentially, Mr. Fowler, II is asking this court to believe that, more than seventy years ago, an alleged surveyor, who would have had the original Elms’ survey of 1902, providing for 52.3 acres, as guidance to determine the boundaries of the property in dispute, drew up this plat and made an error in calculating the acreage of the Fowler tract by underestimating its stated content by a factor of more than three. Even more incredulous is Mr. Fowler, II’s supplication, inherent in his arguments, that this “surveyor” more than thirty years ago, who, likely, would have known of the Elms’ 1902 survey, deliberately underestimated the acreage on the Fowler plat in order to make it conform to the bill of sale of the Fowler tract, mentioned in the oil and gas lease, knowing that the tract he “surveyed” actually contained three times more property than he had inscribed on the plat and more than that appearing in the original bill of sale; in short, that the surveyor, or civil engineer for this alleged plat, in 1918, deliberately created a fraudulent document for Mr. Fowler, II’s grandfather’s oil and gas lease.
Add to this bizarre mix of events the document examiner’s finding that the person “W. H. Sylvester, C.E.,” who had signed six other plats, recorded in the Rapides Parish Courthouse, from the same time period was not the same person who had signed the plat in question can lead this court to only one conclusion — Mr. Fowler, II’s so called plat, dated May 7, 1918, the foundation of his case, is inherently untrustworthy and completely worthless.[1] Accordingly, the Baileys’ evidence, and the document itself, sufficiently overcome any presumption of genuineness. The trial court did not err in ruling this document, retroactively, inadmissible. This assignment of error is without merit.
The Recorded Statement
Mr. Fowler, II claims in this assignment of error that the trial court erroneously refused to consider Mr. Larry 0. Malone’s unsworn recorded statement as substantive evidence. Mr. Fowler, II taped it without Mr. Malone’s consent. The trial court | ^considered the statement only to permit Mr. Malone to be impeached. Mr. Fowler, II called Mr. Malone as a witness, expecting him to testify that an old fence, which they had allegedly found properly marked Mr. Fowler, II’s property boundary before Mr. Malone cut the timber and that the fence encompassed the amount of land Mr. Fowler, II was now claiming. When Mr. Malone did not so testify, the trial court permitted Mr. Fowler, II’s counsel to play Mr. Fowler, II’s previous recordation of Mr. Malone’s statement to Mm.
In that statement, Mr. Malone stated, in part, that: he had cut the D’Autremont’s timber and that he was familiar with the old Fowler place; they had cut up to an old fence which was hexagon shaped; he *144 was aware of the high line crossing the property, and they had found a fence on the north side of the high line; when they found the fence, they quit cutting timber and went to another tract; he told the timber company that they were not going to cut the timber unless they flagged it for them to cut it; the timber company flagged the property down to the creek, but did not flag . it at the fence. Mr. Malone noted that the timber company told him that they had flagged it correctly, as the Fowler, IIs, themselves, did not know where the lines were, after which, he cut the timber. When asked details about the old fence, Mr. Malone stated some of it was rolled up into a ball and that he had seen a few of the iron stakes at the corners of the fence. These are the stakes which Mr. Fowler, II contends represent his property line.
The Baileys respond that, even assuming that the recorded statement should have been given substantive weight, Mr. Fowler, II failed to show that failure to do so was prejudicial error and that in order to prove prejudice, he had to prove that this error, when compared to the record in its entirety, had a substantial effect on the outcome of the case. LaCombe v. Dr. Walter Olin Moss Reg. Hosp., 617 So.2d 612 (La.App. 3 Cir.1993). However, we note another legal reason why the trial court’s decision to only consider the un-sworn recorded statement for impeachment purposes was correct. La.Code Evid. art. 607(D)(2) provides:
Other extrinsic evidence, including prior inconsistent statements and evidence contradicting the witness’ testimony, is admissible when offered solely to attack the credibility of a witness unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice.
12i (Emphasis added.)
It is clear that Mr. Fowler, II’s counsel sought to use the recorded statement to adduce, otherwise, unsworn inadmissible hearsay evidence on the pretext of attacking the credibility of his own witness. Mr. Malone’s recorded statement was only admissible for the purposes of attacking his credibility and no other. La.Code Evid. art. 607(D)(2); see generally, Whitehurst v. Wright, 592 F.2d 834 (5th Cir.1979).
And finally, Mr. Fowler, II’s counsel maintains that the unsworn secretly recorded statement is admissible pursuant to La.Code Evid. art. 801(D)(3) as a Relational and Privity Admission. Such a theory of admissibility requires that there be a “prima facie case of conspiracy” established before such a statement would be admissible. Our review of the record does not establish that such a conspiracy to commit a civil or criminal wrong was factually, or legally, present before Mr. Fowler, II’s counsel sought to introduce the prior inconsistent statement for impeachment purposes. This assignment of error is without merit.
The Fowler, II Boundary Line
Mr. Fowler, II asserts in this assignment of error that the trial court erred in not fixing the boundary line along the line surveyed by Mr. Townsend, which was based upon the 1918 plat discovered one day before trial. Because of our previous discussion and resolution of the above issues, we pretermit further discourse of this issue.
CONCLUSION
The trial court erred in determining the boundary line without regard to the Baileys’ title and relying upon portions of the Louisiana Civil Code that had been repealed. Accordingly, we set aside its boundary determination and fix it according to Mr. Fenstermaker’s survey, which was introduced into evidence as Bailey Exhibit Number 3. Mr. Fowler, II is cast with the costs of the appeal.
REVERSED AND RENDERED.
YELVERTON, J., CONCURS.
*145 [[Image here]]

. See Appendix A.